**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEPHANIE P. AUSTIN,
Plaintiff-Appellee,

v.

PARAMOUNT PARKS, INCORPORATED,

No. 98-1424

d/b/a Kings Dominion, a/k/a
Paramount Kings Dominion,
Defendant-Appellant,

OCTAVIA MARIE EATON,
Movant.

STEPHANIE P. AUSTIN,
Plaintiff-Appellee,

v.

PARAMOUNT PARKS, INCORPORATED,

No. 98-1850

d/b/a Kings Dominion, a/k/a
Paramount Kings Dominion,
Defendant-Appellant,

OCTAVIA MARIE EATON,
Movant.

STEPHANIE P. AUSTIN,
Plaintiff-Appellant,

v.

PARAMOUNT PARKS, INCORPORATED,

No. 98-1897

d/b/a Kings Dominion, a/k/a
Paramount Kings Dominion,
Defendant-Appellee,

OCTAVIA MARIE EATON,
Movant.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-96-1966-PJM)

Argued: April 8, 1999

Decided: November 1, 1999

Before WIDENER and TRAXLER, Circuit Judges,
and BUTZNER, Senior Circuit Judge.

_____

Vacated and remanded by published opinion. Judge Traxler wrote the
opinion, in which Judge Widener and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Steven Colin McCallum, MCGUIRE, WOODS, BAT-
TLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellant.
Andrew J. Toland, SHAPIRO & OLANDER, Baltimore, Maryland,
for Appellee. **ON BRIEF:** F. Brawner Greer, Jonathan T. Blank,
MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond,

Virginia, for Appellant. Charles S. Fax, SHAPIRO & OLANDER, Baltimore, Maryland; Henry L. Marsh, III, HILL, TUCKER & MARSH, Richmond, Virginia, for Appellee.

_____

## OPINION

TRAXLER, Circuit Judge:

Paramount Parks, Inc. ("Paramount") operates an amusement park in Hanover County, Virginia known as "Paramount's Kings Dominion" ("Kings Dominion" or "the park"). While visiting Kings Dominion in May 1994, Stephanie P. Austin ("Austin") was positively identified by two of Kings Dominion's employees as a woman who had passed a bad check at the park less than one week earlier. After questioning Austin for several hours, a special police officer of the Kings Dominion Park Police Department caused a warrant to be issued for Austin's arrest on a charge of grand larceny. The same officer thereafter caused a second warrant to be issued, this time for Austin's arrest on charges of forgery and uttering a forged writing. The Commonwealth's Attorney's Office, with the assistance of the arresting officer, actively prepared the case against Austin over the next nine months. The charges were dismissed before trial, however, once the Commonwealth's Attorney's Office realized that one of the employees who had identified Austin as having passed the bad check in question had later identified another park guest in connection with the same offense.

Austin subsequently brought this civil action against Paramount, asserting a variety of claims arising from her arrests and prosecution on the preceding charges. At trial, the jury returned general verdicts for Austin on her claim under 42 U.S.C.A. § 1983 (West Supp. 1998) and on several claims under Virginia law, and awarded her compensatory and punitive damages. The district court ultimately entered judgment in favor of Austin, denied Paramount's motion for judgment as a matter of law, and awarded Austin attorney's fees and expenses under 42 U.S.C.A. § 1988 (West Supp. 1998) upon finding her to be a prevailing party on the § 1983 claim. This appeal followed.

3

We conclude that Paramount was entitled to judgment as a matter of law on Austin's § 1983 claim because Austin failed to establish that any deprivation of her federal rights was caused by an official policy or custom of Paramount. We further conclude that Virginia law compels judgment as a matter of law in favor of Paramount on Austin's state-law claims because Virginia law shields a private employer from liability when a special police officer takes an action in compliance with a public duty to enforce the law. Accordingly, we reverse the denial of Paramount's motion for judgment as a matter of law, vacate the judgment in favor of Austin, vacate the award of attorney's fees and expenses, and remand with instructions that judgment as a matter of law be entered in favor of Paramount.

I.

The Loss Prevention Department at Kings Dominion ("Loss Prevention") is responsible for providing safety to park guests and employees, preserving park assets, and enforcing Virginia law and park rules and regulations. The security operations group of Loss Prevention consists of special police officers associated with the Kings Dominion Park Police Department, and seasonal uniformed security officers. Unlike the uniformed security officers, the special police officers are sworn conservators of the peace who are authorized to carry firearms, make arrests, and perform the same functions that law enforcement officers in the Commonwealth of Virginia perform. The special police officers derive this authority from an appointment order issued annually, on Paramount's application, by the judges of the Circuit Court of Hanover County under Va. Code Ann.§ 19.2-13 (Michie Supp. 1999).[1]

_____

[1] Va. Code Ann. § 19.2-13(A) provides in relevant part:

> Upon the application of any corporation authorized to do business in the Commonwealth or the owner, proprietor or authorized custodian of any place within the Commonwealth and the showing of a necessity for the security of property or the peace, the circuit court of any county or city, in its discretion, may appoint one or more special conservators of the peace who shall serve as such for such length of time as the court may designate, but not exceeding four years under any one appointment. The

4

The Sheriff of Hanover County had supervisory authority over the special police officers of the Park Police Department that was expressly acknowledged in both the Circuit Court's appointment order and the Park Police Department's Policy and Procedure Manual ("Manual") in force at the time of the events in question. Specifically, the appointment order provided that the special police officers "work only under the control and direction of the Sheriff of Hanover County." This directive was reiterated in the Manual, which provided that the Park Police Department "has direct affiliation with the Hanover County Sheriff's Department and is under the direction of the Sheriff of Hanover County." The Manual further provided:

> The Chain of Command and authority for all Kings Dominion Park Police shall be as follows involving official law enforcement:
>
> a. Sheriff of Hanover County
>
> b. Lieutenant of Kings Dominion Park Police
>
> c. Kings Dominion Park Police Sergeant
>
> d. Kings Dominion Park Police Corporal
>
> e. Kings Dominion Park Police Officer

Although the Park Police Department fell under Loss Prevention in the organizational structure at Kings Dominion, the testimony at trial established that the special police officers performed their law enforcement duties without interference from park management. Chancellor L. Hester ("Hester"), who served as Manager of Loss Prevention at the time of the events in question, provided uncontradicted

---

order of appointment may provide that a special conservator of the peace shall have all the powers, functions, duties, responsibilities and authority of any other conservator of the peace within such geographical limitations as the court may deem appropriate, whenever such special conservator of the peace is engaged in the performance of his duties as such.

testimony that his role in matters of law enforcement was limited to ensuring that guests suspected of committing crimes at the park were treated courteously and professionally. As to decisions pertaining to law enforcement, however, Hester testified that he "let the police officers do the work," knowing that those officers received assistance and direction from the Hanover County Sheriff's Department and the Commonwealth's Attorney's Office. The annual training that the special police officers received reflected this division. Hester provided instruction on interpersonal skills, while the Sheriff's Department and the Commonwealth's Attorney's Office taught law enforcement classes on such topics as the laws of arrest, the conducting of interviews, self-defense, and searches and seizures.

The principal events giving rise to the present litigation occurred at Kings Dominion on May 15, 1994, when a guest arrived at the park's Season Pass office and submitted a check for $360 under the name of "Donita Morgan." Japata Taylor ("Taylor"), a park cashier, accepted the check and proceeded to retrieve $360 worth of Kings Dominion currency, known as "Scooby dollars," which guests use to purchase merchandise for sale within the park. Meanwhile, a guest at the next window submitted a check under the name of "Catherine May" to Joshua Stone ("Stone"), another park cashier. Because the Season Pass office did not have enough Scooby dollars to cash the two checks, Taylor and Stone contacted their supervisor, Deborah Samuel ("Samuel"). Samuel then had a chance to observe "Donita Morgan" and "Catherine May" after obtaining a sufficient amount of Scooby dollars from the park's Cash Control office.

Several days later, Loss Prevention learned that both the "Donita Morgan" check accepted by Taylor and the "Catherine May" check accepted by Stone were fraudulent. In fact, numerous fraudulent checks under these and other names had been passed at Kings Dominion during the May 14-15 weekend. Loss Prevention suspected that a group of individuals were operating an illegal check-cashing scheme at the park using fraudulent identification cards and fraudulent checks,[2] and provided the park's cashiers with a memorandum

_____

[2] The fraudulent checks were used to obtain Scooby dollars, which in turn were used to purchase park merchandise. The merchandise would then be returned for a refund in cash.

6

listing various names under which bad checks had already been passed, including "Catherine May." The cashiers were directed to immediately inform Loss Prevention should a guest submit a check under a listed name.

Sergeant Cindy Gatewood ("Gatewood") of the Park Police Department supervised the investigation into the apparent check-cashing scheme. On the morning of Saturday, May 21, 1994, six days after Taylor and Stone had accepted the "Donita Morgan" check and the "Catherine May" check, respectively, Gatewood obtained verbal descriptions of the suspects from Samuel, Taylor, and Stone. According to Gatewood's testimony at trial, Samuel described "Donita Morgan" as a "middle-aged black woman with twisted hair." Taylor described that suspect as "a black female, five foot five, five foot six, average build, twisted hair braids, sunglasses." After obtaining verbal statements, Gatewood asked each of the three employees to prepare written statements. In her written statement, Taylor described "Donita Morgan" as a woman who had braided hair and wore Chanel sunglasses. Samuel, in her written statement, described her as "a middle-aged black woman with glasses, long twisted braids, and a lot of children."

Austin, an African-American woman who at the time was a twenty-three-year-old student at the University of Maryland, was among the more than 20,000 guests of Kings Dominion on Saturday, May 21. That evening, Taylor saw Austin in the park and identified her as the "Donita Morgan" suspect from the previous weekend. Taylor alerted Loss Prevention accordingly. Officer Michael Drummer ("Drummer") of the Park Police Department subsequently approached Austin and escorted her to the Loss Prevention office. After being contacted at home and apprised of the situation, Gatewood arranged for Investigator Robert Schwartz ("Schwartz") of the Hanover County Sheriff's Department to meet her at the Loss Prevention office. In the interim, Samuel went to the Loss Prevention office and, like Taylor, identified Austin as the "Donita Morgan" suspect from the previous weekend.

After arriving at the Loss Prevention office, Schwartz advised Austin of her Miranda rights. He and Gatewood then informed Austin that two employees had positively identified her as having passed a

7

fraudulent "Donita Morgan" check at the Season Pass office on May 15, 1994, and questioned Austin for several hours as to her whereabouts on that date. According to Gatewood's testimony at trial, Austin stated that she was at a banquet at the University of Maryland on May 15, 1994, but Austin refused to provide any information which would allow that statement to be verified. Consistent with his role as Manager of Loss Prevention, Hester occasionally appeared for several minutes to observe the questioning. Hester testified at trial that his purpose in doing so "was to make sure that our folks were handling their duties properly, that the police were in the process of moving this situation forward, and that the people involved in it were being handled professionally and properly."

Based primarily upon the accounts of Taylor and Samuel, whom Gatewood described at trial as "more than a hundred percent sure that Miss Austin was the one who had written a check to them," Gatewood decided to arrest Austin. Before doing so, however, Gatewood contacted Seward M. McGhee ("McGhee") of the Commonwealth's Attorney's Office, who advised Gatewood that Austin could be charged only with grand larceny until the bank had processed and returned the bad "Donita Morgan" check at issue. Schwartz thereafter transported Austin to the Hanover County Magistrate's office, where Gatewood caused a warrant to be issued for Austin's arrest on a charge of grand larceny in violation of Va. Code Ann. § 18.2-95 (Michie Supp. 1999).[3]

_____

[3] While Schwartz transported Austin, Gatewood proceeded to the Hanover County Magistrate's Office with Octavia Marie Eaton ("Eaton"), whom Stone and Taylor had identified as the "Catherine May" suspect from the previous weekend. Eaton was ultimately brought to trial on charges of grand larceny, forgery, and uttering forged checks, but the trial court dismissed the charges on the basis that Eaton's guilt could not be established beyond a reasonable doubt. Eaton subsequently brought a civil action against Paramount, asserting various claims under Virginia law. The United States District Court for the Eastern District of Virginia entered summary judgment in favor of Paramount, however, holding that no genuine issue of fact existed as to whether Gatewood had probable cause to believe that Eaton had committed the offenses in question. On appeal, this court agreed and affirmed. See Eaton v. Paramount Parks, Inc., No. 96-2518, 141 F.3d 1158, 1998 WL 163833 (4th Cir. Apr. 6, 1998) (per curiam) (unpublished).

On the following day, Sunday, May 22, 1994, a significant development occurred with respect to the investigation into the check-cashing scheme at Kings Dominion. Specifically, a guest named Annette Williams arrived at the Season Pass office and submitted a check under the name of "Catherine May." The park cashier who accepted the check recognized "Catherine May" from the memorandum distributed in connection with the scheme and immediately contacted Loss Prevention. Simultaneously, a guest named Tonya Williams submitted a check at the Season Pass office under the name of "Demetry Gordon."

Gatewood subsequently arrived at the Season Pass office in response to the cashier's call. When Gatewood asked Annette Williams to come to the Loss Prevention office, Tonya Williams became visibly agitated. Gatewood described the situation at trial in the following manner: "a friend of [Annette Williams] got very verbal and upset and said she didn't understand why I was taking her friend away, so I invited her to come to the office with me." During this encounter, Samuel saw Tonya Williams, an African-American woman who had braided hair, and identified her as the woman who had submitted the "Donita Morgan" check to Taylor one week earlier.

Gatewood subsequently brought Annette Williams and Tonya Williams to the Loss Prevention office for questioning. During the questioning, the women maintained their respective false identities as Catherine May and Demetry Gordon. Later that day, after Annette Williams and Tonya Williams had left the park, Gatewood discovered their actual identities when a guest named Gladys Ann Williams was brought to the Loss Prevention office after submitting a fraudulent check at the Season Pass office under the name of "Michelle Lockhart." In a detailed confession, Gladys Ann Williams confirmed the existence of a check-cashing scheme, provided the names and aliases of the other participants in the scheme, and provided information concerning the source from whom they had obtained fraudulent identification cards and fraudulent checks.

That evening, Samuel alerted Hester at Loss Prevention that she had recognized Tonya Williams as the woman who had submitted the "Donita Morgan" check to Taylor on May 15, 1994. Hester's unrefuted testimony indicates that he personally informed Gatewood of

9

this development later that evening. Samuel's observation, along with written statements filed by other park employees, led Gatewood and Hester to conclude that Tonya Williams was one of several women who had passed bad checks at the park under the name of "Donita Morgan." When asked at trial whether she specifically informed McGhee that Samuel had identified Tonya Williams as"Donita Morgan," Gatewood responded that "I'm not sure if I told him those exact words, but he was advised that there was more than one Donita Morgan." Ultimately, Gatewood testified, McGhee advised her that "there's more than one person, you have your witnesses, and we're going to go forward with the case, if there's a scheme, and bust the scheme."

Gatewood thereafter caused a warrant to be issued for Austin's arrest on charges of forgery and uttering a forged writing in violation of Va. Code Ann. § 18.2-172 (Michie 1996). According to Gatewood's uncontradicted testimony at trial, she did so only after consulting McGhee once the "Donita Morgan" checks from May 15, 1994, had been processed by the bank and returned to Kings Dominion. Specifically, Gatewood testified that McGhee"told me when the checks came in, I was to give him a call. I did, and he advised me to go get the warrants." Gatewood subsequently informed Hester that she spoke to McGhee and that she intended to bring additional charges against Austin. In this regard, Hester testified at trial that Gatewood "indicated to me somewhere in that period of time, I don't remember the exact date or anything, that [McGhee] and she had had a conversation, and the charges were being amended, yes, sir, I was aware of that." Gatewood did not serve Austin with the second arrest warrant until July 14, 1994, when Austin returned to the Hanover County Magistrate's Office for a preliminary hearing on the charge of grand larceny. Austin was not further detained and was allowed to remain out on her original bond.

In January 1995, a Hanover County general district court conducted a preliminary hearing on the charges pending against Austin. Based primarily upon Gatewood's testimony, the court found probable cause to certify the charges for trial. In so doing, the court indicated that it would have dismissed the charges had Austin presented any evidence supporting her alibi: "if I would have had any evidence at all that there was a banquet on May the 15th and if, in fact, [Austin]

10

could have come in here and presented that [she] attended a banquet on May the 15th, then there would be no question in my mind." Although a Hanover County grand jury subsequently indicted Austin on the charges, the matter did not proceed to trial. Rather, in April 1995, McGhee had the charges dismissed. McGhee did so apparently upon learning that Samuel, only one day after identifying Austin as having passed the "Donita Morgan" check to Taylor on May 15, 1994, identified Tonya Williams in connection with the same offense.

## II.

Austin initiated the present litigation by filing a civil action in Maryland state court, naming Paramount as the only defendant. Following Paramount's removal of the action to the district court, Austin filed an eight-count second amended complaint, counts one through five of which contained claims arising under Virginia law for false arrest, false imprisonment, malicious prosecution, assault and battery, and negligence, respectively. Counts six through eight, on the other hand, contained claims arising under federal law. [4] With respect to her § 1983 claim asserted in count six, Austin alleged primarily that she suffered a deprivation of her federal constitutional rights as a result of Paramount's policy of causing individuals suspected of passing bad checks at Kings Dominion to be detained, arrested, and prosecuted, even without probable cause, to deter other park guests from engaging in such conduct. Austin also alleged that Paramount failed to exercise due care in the hiring, retention, training, and supervision of employees who participated in the investigation, detention, and arrest of individuals suspected of passing bad checks at Kings Dominion, and that such failure manifested a conscious disregard for Austin's rights. These latter allegations essentially reiterated the allegations supporting Austin's state-law negligence claim asserted in count five.

The matter ultimately proceeded to trial by jury. At the conclusion of Austin's evidence, Paramount moved under Rule 50(a) of the Federal Rules of Civil Procedure for judgment as a matter of law on all

_____

[4] Before trial, Paramount moved for summary judgment on each count asserted in Austin's second amended complaint. The district court granted the motion solely with respect to counts seven and eight. Austin does not challenge that ruling on appeal.

six counts. The district court denied the motion, and subsequently denied Paramount's renewed Rule 50(a) motion brought at the conclusion of all of the evidence. Moreover, the district court ruled as a matter of law that Hester constituted a "policymaker" of Paramount for purposes of § 1983 liability. The district court incorporated this ruling into its charge on the § 1983 claim, specifically instructing the jury that "Chance Hester was a policy maker of defendant Paramount Parks, Inc."

The district court provided the jury with a special verdict form to be completed during its deliberations. The form directed the jury to answer numerous interrogatories and to return a general verdict for either Austin or Paramount on each claim.**5** The first set of interrogatories addressed whether there was probable cause to arrest Austin on a charge of grand larceny on May 21, 1994. Although finding that employees Taylor and Samuel did not themselves have probable cause to believe that Austin had committed a crime, the jury found that Drummer, Gatewood, and Hester, along with "[Paramount's] regular employees and special police officers, acting together," did have probable cause to believe that Austin had committed a crime. Accordingly, the jury returned a general verdict for Paramount on Austin's state-law claim for false arrest (May 21, 1994).

The second set of interrogatories concerned Austin's July 14, 1994 arrest on charges of forgery and uttering a forged writing. The jury found that "[Paramount] participated in the decision to charge [Austin] on July 14, 1994," and that Paramount lacked probable cause to believe that Austin had committed the offenses in question. Moreover, the jury found that Paramount's actions in this regard were based upon the actions of both Gatewood and Hester. Therefore, the jury returned a general verdict for Austin on her state-law claim for false arrest (July 14, 1994).

_____

**5** Before the case was submitted to the jury, Austin withdrew her claim for false imprisonment asserted in count two. Also, during the jury's deliberations, the district court converted the claim for false arrest asserted in count one into two separate claims, one pertaining to each date on which Austin was arrested. We shall refer to these claims as "false arrest (May 21, 1994)" and "false arrest (July 14, 1994)," respectively.

12

The third set of interrogatories concerned Austin's state-law claim for malicious prosecution. The jury found that, prior to the dismissal of the charges, Paramount lacked probable cause to have Austin prosecuted. The jury further found that Paramount's actions in this respect were based upon Gatewood's actions and not upon Hester's actions. Ultimately, the jury returned a general verdict for Austin on her state-law claim for malicious prosecution. The jury returned a general verdict for Paramount, however, on Austin's state-law claims for assault and battery, and negligence.

The jury was then presented with three interrogatories on the § 1983 claim, each of which ultimately asked the jury whether a particular action was taken "pursuant to a policy, custom or practice of [Paramount]." The first interrogatory asked the jury whether Drummer and Gatewood lacked probable cause to arrest Austin on May 21, 1994 and, if so, whether Drummer or Gatewood arrested Austin on that date pursuant to a policy, custom, or practice of Paramount. Because the jury had earlier found that both Drummer and Gatewood had probable cause to arrest Austin on May 21, 1994, it did not reach the "policy, custom, or practice" issue. The second § 1983 interrogatory asked the jury whether Gatewood and Hester lacked probable cause to have Austin arrested on July 14, 1999 and, if so, whether Austin was arrested on that date pursuant to a policy, custom, or practice of Paramount. The jury determined that the actions of Gatewood and Hester in this respect were <u>not</u> taken pursuant to a policy, custom, or practice of Paramount. In the third § 1983 interrogatory, the jury was asked whether Paramount lacked probable cause to continue to prosecute Austin before the charges were dismissed and, if so, whether Austin was being prosecuted pursuant to a policy, custom, or practice of Paramount. The jury determined that Paramount's actions were <u>not</u> taken pursuant to a policy, custom, or practice of Paramount.

The end result, of course, is that in none of the § 1983 interrogatories did the jury find that Austin's arrest and prosecution resulted from a policy, custom, or practice of Paramount. Nevertheless, the jury returned a general verdict for Austin on her § 1983 claim. The jury awarded Austin $40,000 in compensatory damages and $40,000 in punitive damages, for a total damages award of $80,000.

Following the announcement of the jury's general verdicts and interrogatory answers, the district court thanked the jurors for their

13

service and asked the parties "[i]f there is nothing before we dismiss the jurors[?]" When both parties responded"No, Your Honor," the district court informed the jurors that their service was completed and discharged them accordingly. Shortly afterwards, the district court reviewed the special verdict form and acknowledged that the jury had not found that a policy, custom, or practice of Paramount caused an alleged deprivation of Austin's rights. Accordingly, the district court stated that the jury "really could not find count 6 [the § 1983 claim] in favor of the plaintiff," observing that "factually the predicate for any finding in favor of the plaintiff on count 6 would not be present, given the findings of the jury on all the underlying answers."

Relying upon the jury's interrogatory answers on the§ 1983 claim, Paramount moved for entry of judgment on that claim under Rule 49(b) of the Federal Rules of Civil Procedure. The district court, however, denied the motion and entered final judgment in accordance with the jury's general verdicts and damages award. **6** The court thereafter denied Paramount's Rule 50(b) of the Federal Rules of Civil Procedural for judgment as a matter of law on the claims upon which Austin prevailed, thereby leaving the final judgment intact. Then, upon finding Austin to be a prevailing party on the§ 1983 claim, <u>see</u> 42 U.S.C.A. § 1988(b), the district court awarded her $256,365.80 in attorney's fees and expenses.

Paramount now appeals from the judgment, from the denial of its Rule 49(b) motion for entry of judgment on the § 1983 claim, from the denial of its Rule 50(b) motion for judgment as a matter of law, and from the award of attorney's fees and expenses. Austin cross-appeals from the award of attorney's fees and expenses, asserting that the district court failed to consider certain work performed following entry of final judgment in calculating that award, including the preparation and defense of the motion for attorney's fees and expenses.

_____

**6** In so doing, the district court denied in part Austin's post-trial motion for entry of judgment in her favor on all claims submitted to the jury. Austin does not challenge this ruling on appeal.

14

III.

We first address Paramount's contention that it was entitled under Rule 49(b) to entry of judgment on the § 1983 claim in accordance with the jury's interrogatory answers. We shall then determine whether Paramount was entitled to judgment as a matter of law on the § 1983 claim either because Paramount was not a state actor or because Austin failed to establish that any deprivation of federal rights was caused by an official policy or custom of Paramount. Finally, we shall determine whether Paramount was entitled to judgment as a matter of law on Austin's claims for false arrest (July 14, 1994) and malicious prosecution on the ground that Gatewood, as a special police officer, was engaged in the performance of her public duty to enforce Virginia law when she arrested Austin and assisted with the prosecution.

A.

Rule 49(b) permits a district court to "submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." Fed. R. Civ. P. 49(b). The Rule contemplates three scenarios that may result from such an approach, and provides the district court with corresponding courses of action. First, if the general verdict and the interrogatory answers are harmonious, "the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58." Id. Second, if the interrogatory answers are consistent with each other but one or more is inconsistent with the general verdict, the district court may enter judgment in accordance with the interrogatory answers notwithstanding the general verdict, return the jury for further consideration of its interrogatory answers and general verdict, or order a new trial. Third, if the interrogatory answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the district court is prohibited from entering judgment, but may order a new trial or return the jury for further consideration of its interrogatory answers and general verdict.

We have previously considered the ramifications of a litigant's failure to challenge a verdict as inconsistent under Rule 49(b) until after the jury has been discharged. In White v. Celotex Corp., 878 F.2d 144

15

(4th Cir. 1989) (per curiam), the plaintiffs moved for a new trial under Rule 49(b) on the ground that the jury's interrogatory answers were inconsistent with each other and likewise inconsistent with the general verdict for the defendants, thus implicating the third Rule 49(b) scenario. The motion, however, was not brought until after the discharge of the jury. In affirming the district court's determination that the motion was barred from consideration and that judgment was properly entered in favor of the defendants, we noted that the purpose of Rule 49(b) is "to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body." Id. at 146. We determined, therefore, that the Rule obligates a party "to object to any asserted inconsistencies in the response to jury interrogatories prior to the discharge of the jury," id., and that failure to comply with that obligation "will constitute a waiver of a party's right to seek a new trial," id.

In the present litigation, the district court held that Paramount's Rule 49(b) motion for entry of judgment on Austin's § 1983 claim was barred under White because Paramount failed to raise the alleged inconsistency between the interrogatory answers and general verdict prior to the discharge of the jury. The district court further held that the general verdict on the § 1983 claim could be reconciled with the jury's finding that Paramount lacked probable cause to arrest Austin on July 11, 1994, and that Paramount's actions in that regard were based upon the actions of Hester, whom the district court had held to be a "policymaker" of Paramount for purposes of § 1983 liability. Accordingly, the district court entered judgment in favor of Austin on the § 1983 claim in accordance with the general verdict.

Paramount challenges the district court's determination that its Rule 49(b) motion was barred. In particular, Paramount argues that the jury's § 1983 interrogatory answers were not inconsistent with each other, only inconsistent with the general verdict, and thus the present matter involved the second Rule 49(b) scenario. Paramount properly notes that, under the second scenario, a district court may enter judgment in accordance with the interrogatory answers notwithstanding the general verdict, return the jury for further consideration of its interrogatory answers and general verdict, or order a new trial. Emphasizing that it does not seek a new trial in the present appeal,

16

Paramount concedes that White would have barred a motion for a new trial because Paramount failed to raise the asserted inconsistency prior to the jury's discharge. However, Paramount maintains, White does not bar a motion for entry of judgment because such relief, unlike a new trial, does not implicate the efficiency concerns underlying White.

The inherent flaw in Paramount's analysis is the notion that a district court is constrained by the options delineated in Rule 49(b) despite a litigant's failure to raise an asserted inconsistency before the jury is discharged. Were that the case, the district court in White could not have entered judgment in favor of the defendants because entry of judgment is expressly prohibited in a situation falling within the third Rule 49(b) scenario. Indeed, had the third scenario in Rule 49(b) controlled in White, the district court's only remaining option would have been to order a new trial, precisely the relief that we held to be barred in that case. Accordingly, under White , a litigant's failure to raise an inconsistency before the jury is discharged renders Rule 49(b) inapplicable and thus precludes that litigant from relying upon the inconsistency to challenge an adverse disposition.

Furthermore, we reject Paramount's position that the efficiency concerns underlying White are not applicable when a party seeks entry of judgment rather than a new trial. Irrespective of the relief sought by a litigant asserting a Rule 49(b) inconsistency, a district court could ultimately determine that the best course of action with respect to such an inconsistency is to order a new trial, an option available under both the second and third Rule 49(b) scenarios. However, should the objecting party fail to raise the inconsistency prior to the jury's discharge, the court will effectively lose the opportunity to have the jury reconsider the inconsistency. As a result, the primary purpose of Rule 49(b) will have been defeated. See White, 878 F.2d at 146 (noting that the purpose of Rule 49(b) is "to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body"). Accordingly, we conclude that Paramount's Rule 49(b) motion for entry of judgment in accordance with the interrogatory answers on Austin's § 1983 claim was properly barred in light of its failure to raise the alleged inconsistency prior to the jury's discharge.

17

B.

Paramount next maintains that it was entitled to judgment as a matter of law on Austin's § 1983 claim either because Paramount was not a state actor or because Austin failed to establish that an official policy or custom of Paramount caused a deprivation of her federal rights. We review de novo a district court's denial of a Rule 50(b) motion for judgment as a matter of law, viewing the evidence in the light most favorable to the prevailing party and drawing all reasonable inferences in her favor. See Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir.), cert. denied, 68 U.S.L.W. 3106 (U.S. Oct. 4, 1999) (No. 99-180).

Section 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C.A. § 1983. To prevail against Paramount on her § 1983 claim, Austin had the burden to establish that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan, 119 S. Ct. 977, 985 (1999). Paramount does not dispute that Austin's rights under the Fourth and Fourteenth Amendments were violated when Gatewood effected the July 14, 1994 arrest without probable cause. However, Paramount does dispute that it was a state actor for purposes of § 1983 merely because it employed Gatewood as a special police officer.

The question of whether Paramount was a state actor is a thorny one, but one which we need not decide here because Austin's clear failure to show that an official policy or custom of Paramount was the moving force behind Austin's July 14, 1994 arrest negates the necessity of addressing the issue. For purposes of our review we will

18

assume, without holding, that Paramount was a state actor and proceed to consider Paramount's challenge to Austin's assertion that Paramount had an official policy or custom justifying the imposition of liability under § 1983.

Our analysis begins with general principles of municipal liability. In <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978), the Supreme Court held that municipalities and other local governmental bodies constitute "persons" within the meaning of § 1983, <u>see id.</u> at 688-89. The Court, however, has consistently refused to impose § 1983 liability upon a municipality under a theory of <u>respondeat superior</u>. <u>See Board of the County Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997). Rather, under <u>Monell</u> and its progeny, a municipality is subject to § 1983 liability only when "it causes such a deprivation through an official <u>policy</u> or <u>custom</u>." <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999) (emphasis added). We have determined that "[m]unicipal policy may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." <u>Id.</u> (internal citations omitted). Municipal custom, on the other hand, may arise when a particular practice "is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." <u>Id.</u> (internal quotation marks omitted).

We have recognized, as has the Second Circuit, that the principles of § 1983 municipal liability articulated in <u>Monell</u> and its progeny apply equally to a private corporation that employs special police officers. Specifically, a private corporation is not liable under § 1983 for torts committed by special police officers when such liability is predicated solely upon a theory of <u>respondeat superior</u>. <u>See Powell v. Shopco Laurel Co.</u>, 678 F.2d 504 (4th Cir. 1982); <u>Rojas v. Alexander's Dep't Store, Inc.</u>, 924 F.2d 406 (2d Cir. 1990); <u>see also Sanders v. Sears, Roebuck & Co.</u>, 984 F.2d 972, 975-76 (8th Cir. 1993) (concluding that private corporation is not subject to § 1983 liability under theory of <u>respondeat superior</u> regarding acts of private security guard employed by corporation); <u>Iskander v. Village of Forest Park</u>, 690 F.2d 126, 128 (7th Cir. 1982) (same). Rather, a private corporation is liable under § 1983 <u>only</u> when an official policy or custom of the cor-

19

poration causes the alleged deprivation of federal rights. See Rojas, 924 F.2d at 408; Sanders, 984 F.2d at 976; Iskander, 690 F.2d at 128.

In her second amended complaint, Austin primarily alleged in support of her § 1983 claim that she suffered a deprivation of her federal constitutional rights as a result of Paramount's policy of causing individuals suspected of passing bad checks at Kings Dominion to be detained, arrested, and prosecuted, even without probable cause, to deter other park guests from engaging in such conduct. At trial, however, Austin was unable to present any evidence to substantiate those allegations. Rather, Austin's evidence focused on her alternative theory of § 1983 liability, also alleged in the second amended complaint, that Paramount failed to exercise due care in training employees who participated in the investigation, detention, and arrest of individuals suspected of passing bad checks at Kings Dominion, and that such failure manifested a conscious disregard for Austin's rights. Indeed, the district court, in denying Paramount's motion for judgment as a matter of law on the § 1983 claim at the close of Austin's evidence, relied solely upon this theory:

> I think there's evidence from which [Austin] can argue in this case that really it was a pretty patchy situation at [Kings Dominion], that they really didn't have any clear-cut training program to educate their personnel on dealing with customers who are suspected of passing bad checks. They did something, but arguably it was pretty patchy, and it seems to me it could be argued that it was deliberately indifferent.

On appeal, however, Austin has abandoned the preceding theory of § 1983 liability, obviously because the general verdict in favor of Paramount on the negligence claim contained in count five and the adverse interrogatory answers on the § 1983 claim showed that the jury rejected Austin's claim of inadequate training. Now, Austin presents a theory of § 1983 liability that resembles the reasoning offered by the district court in disposing of Paramount's Rule 49(b) motion and is purportedly reconcilable with the jury's verdict. Specifically, Austin argues that Hester was a policymaker who acquiesced in Gatewood's intention to effect the July 14, 1994 arrest of Austin on charges of forgery and uttering a forged writing, and who thereby subjected Paramount to liability. We find this claim untenable.

20

1.

The Supreme Court has recognized that, under appropriate circumstances, a municipality may incur § 1983 liability for a single decision of a policymaking official. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) (plurality opinion) (holding county liable under § 1983 when county prosecutor instructed sheriff's deputies to forcibly enter plaintiff's place of business to serve capiases upon third parties); Carter, 164 F.3d at 218 ("Municipal policy may be found . . . in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens.") (internal citations omitted). In determining whether an individual constitutes a "policymaking official" in this sense, courts inquire whether the individual speaks "with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); see Pembaur, 475 U.S. at 481 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."). Whether the individual in question exercises such authority "is not a question of fact in the usual sense." City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988). Rather, the inquiry "is dependent upon an analysis of state law," McMillian v. Monroe County, Alabama, 520 U.S. 781, 786 (1997), requiring review of "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." Jett, 491 U.S. at 737 (internal quotation marks omitted). A district court's determination of whether an individual exercises final policymaking authority in a particular area is reviewed de novo. See Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997); Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1992).

The foregoing principles of § 1983 "policymaker" liability were articulated in the context of suits brought against municipalities and other local government defendants. Nevertheless, these principles are equally applicable to a private corporation acting under color of state law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights. See Howell v. Evans, 922 F.2d 712, 724-25, vacated after settlement,

21

931 F.2d 711 (11th Cir. 1991) (assessing whether prison medical director employed by private corporation exercised final policymaking authority for employer concerning equipment and staff procurement). In the present appeal, Austin asserts that Paramount's liability under § 1983 derives from Hester's single decision to acquiesce in Gatewood's intention to effect Austin's July 14, 1994 arrest on charges of forgery and uttering a forged writing. Accordingly, the relevant "policymaker" inquiry is whether Hester, as a matter of state and local positive law, or custom or usage having the force of law, see Jett, 491 U.S. at 737, exercised final policymaking authority concerning arrests effected by the special police officers of the Park Police Department.**7** We are satisfied that he did not.

First, nothing in the positive law of the Commonwealth of Virginia or of Hanover County granted Hester any policymaking authority concerning arrests effected by the special police officers. In particular, nothing in the Virginia statute authorizing the appointment of special police officers granted a private corporation or any of its employees authority over the law enforcement functions performed by those officers. See Va. Code Ann. § 19.2-13(A). Moreover, nothing in the appointment order issued by the Circuit Court of Hanover County granted any authority over the special police officers' law enforcement functions to any of Paramount's employees, including the Manager of Loss Prevention. Indeed, the appointment order explicitly mandated that those officers "work only under the control and direction of the Sheriff of Hanover County."

Second, nothing in the written policies of Paramount or of Kings Dominion granted Hester any policymaking authority over arrests effected by the special police officers. The Park Police Department's Policy and Procedure Manual provided that the Park Police Department "has direct affiliation with the Hanover County Sheriff's Department and is under the direction of the Sheriff of Hanover County." The Manual further provided:

---

**7** At trial, the district court instructed the jury that Hester was "a policy maker of defendant Paramount Parks, Inc.," but failed to specify the area in which Hester purportedly exercised final policymaking authority for Paramount.

22

The Chain of Command and authority for all Kings Dominion Park Police shall be as follows involving official law enforcement:

a. Sheriff of Hanover County

b. Lieutenant of Kings Dominion Park Police

c. Kings Dominion Park Police Sergeant

d. Kings Dominion Park Police Corporal

e. Kings Dominion Park Police Officer

Aside from effectively illustrating the final authority of the Sheriff of Hanover County over the special police officers, the preceding list conspicuously omitted any reference to the Manager of Loss Prevention.

Third, even viewing the evidence at trial in the light most favorable to Austin and drawing all reasonable inferences in her favor, we cannot conclude that Hester had any policymaking authority concerning arrests effected by the special police officers as a matter of custom or usage having the force of law. See Jett, 491 U.S. at 737. At trial, Austin presented no evidence that Hester had ever directed a special police officer to effect an arrest or that he had ever prevented the same. Moreover, there was no evidence that the special police officers routinely consulted Hester or obtained his approval concerning impending arrests. Nor was there any evidence that Gatewood consulted Hester or obtained his approval concerning the two arrests in the present litigation. Rather, Gatewood's testimony regarding the events preceding those arrests demonstrates that she consulted only McGhee of the Commonwealth's Attorney's Office. Furthermore, when asked whether he knew that Gatewood planned to bring additional charges against Austin, Hester testified that "[Gatewood] indicated to me somewhere in that period of time . . . that [McGhee] and she had had a conversation, and the charges were being amended, yes, sir, I was aware of that." Although certainly suggesting that Gatewood kept Hester informed as to the status of Austin's case, this testi-

23

mony in no way indicates that Gatewood attempted either to consult with Hester or to obtain his approval regarding her decision to bring additional charges against Austin. Put simply, there was no evidence that Hester, despite his title of Manager of Loss Prevention, in practice exercised any control over the decisions of the special police officers regarding detention and/or arrests of park guests suspected of criminal offenses in this case or any other case. Indeed, the uncontradicted testimony was to the contrary. In fact, we find no support in the record for any specific policymaking authority given to or exercised by Hester regarding matters of law enforcement. The questions simply were not asked, nor was evidence ever produced in this regard.

In light of the foregoing analysis, we have no basis upon which to conclude that Hester exercised final policymaking authority concerning arrests effected by the special police officers of the Park Police Department. Because Austin's position on Paramount's liability under § 1983 rests entirely upon her theory that Hester was a "policymaker," we are satisfied that she failed to establish that any deprivation of her federal rights was caused by an official policy or custom of Paramount. Accordingly, we conclude that Paramount was entitled to judgment as a matter of law on Austin's § 1983 claim.**8**

2.

Because Paramount was entitled to judgment as a matter of law on Austin's § 1983 claim, Austin cannot be considered a prevailing party on that claim for purposes of § 1988. We therefore vacate the district court's award of attorney's fees and expenses. Accordingly, we need not address the issue presented in Austin's cross-appeal, which pertains solely to the district court's calculation of that award.

_____

**8** It is worth remembering that the jury found Austin's July 14, 1994 arrest was not effected pursuant to a policy, custom, or practice of Paramount, notwithstanding the district court's instruction that Hester was a "policymaker" of Paramount. The net result in this case is that there was neither a legal nor a factual basis to find Paramount liable under § 1983 based upon a policy.

C.

Lastly, we turn to the issue of whether Paramount is entitled to judgment as a matter of law on Austin's state-law claims for false arrest (July 14, 1994) and malicious prosecution. Again, we review <u>de novo</u> the district court's denial of Paramount's Rule 50(b) motion for judgment as a matter of law, viewing the evidence in the light most favorable to Austin and drawing all reasonable inferences in her favor. <u>See Konkel</u>, 165 F.3d at 279.

The Virginia Supreme Court has established that a private employer may not be held liable under a theory of <u>respondeat superior</u> for torts committed by a special police officer when he or she acts as a public officer, as opposed to an agent, servant, or employee of the employer. <u>See Norfolk & W. Ry. Co. v. Haun</u>, 187 S.E. 481, 482 (Va. 1936); <u>Glenmar Cinestate, Inc. v. Farrell</u>, 292 S.E.2d 366, 369-70 (Va. 1982). The court elaborated upon this key distinction in <u>Glenmar</u>:

> Moreover, we held in <u>N. & W. Ry. Co. v. Haun</u>, 167 Va. 157, 187 S.E. 481 (1936), that a special police officer appointed by public authority, but employed and paid by a private party, does not subject his employer to liability for his torts when the acts complained of are performed in carrying out his duty as a public officer. The test is: in what capacity was the officer acting at the time he committed the acts for which the complaint is made? If he is engaged in the performance of a public duty such as the enforcement of the general laws, his employer incurs no vicarious liability for his acts, even though the employer directed him to perform the duty. On the other hand, if he was engaged in the protection of the employer's property, ejecting trespassers or enforcing rules and regulations promulgated by the employer, it becomes a jury question as to whether he was acting as a public officer or as an agent, servant, or employee.

292 S.E.2d at 369-70.

25

In the present litigation, the only viable factual predicate for Austin's claims for false arrest (July 14, 1994) and malicious prosecution is that Gatewood lacked probable cause to effect the July 14, 1994 arrest and further lacked probable cause to assist with the prosecution of the pertinent charges.**9** It is without question, however, that Gatewood effected Austin's arrest and assisted with the prosecution in the course of performing her public duty to enforce the Commonwealth of Virginia's law against forgery and uttering a forged writing. See Va. Code Ann. § 18.2-172. Accordingly, under Glenmar, the issue of whether Gatewood acted in her capacity as a public officer was not one for the jury's resolution.

Because Austin presented no evidence that Gatewood acted other than in her capacity as a public officer in effecting Austin's July 14, 1994 arrest and assisting with the prosecution, Paramount cannot be held vicariously liable with respect to Austin's claims for false arrest (July 14, 1994) and malicious prosecution. See Glenmar, 292 S.E.2d at 369 ("If [the officer was] engaged in the performance of a public duty such as the enforcement of the general laws, his employer incurs no vicarious liability for his acts. . . ."). We conclude, therefore, that Paramount was entitled to judgment as a matter of law on both claims.**10**

IV.

In summary, we conclude that Paramount was entitled to judgment as a matter of law on Austin's § 1983 claim because Austin failed to establish that any deprivation of her federal rights was caused by an official policy or custom of Paramount. We further conclude that, because Gatewood was engaged in the performance of her public duty

_____

**9** In light of our analysis in part III.B., we are satisfied that there is no basis for the jury's finding that Austin's July 14, 1994 arrest was based upon Hester's actions. Indeed, the record is devoid of any evidence that Hester participated in or approved the decision to effect that arrest or that he could have prevented that arrest upon learning of Gatewood's intention to bring additional charges.

**10** Although certain individuals may have been liable for their acts in regard to Austin's arrest and prosecution, Austin did not join them as defendants in the present litigation. Rather, Austin chose to bring suit only against Paramount.

to enforce Virginia law when she effected Austin's July 14, 1994 arrest and assisted with the prosecution, Paramount was entitled to judgment as a matter of law on Austin's claims for false arrest (July 14, 1994) and malicious prosecution. Accordingly, we reverse the denial of Paramount's Rule 50(b) motion for judgment as a matter of law, vacate the judgment in favor of Austin, vacate the award of attorney's fees and expenses, and remand with instructions that judgment as a matter of law be entered in favor of Paramount.

VACATED AND REMANDED

27