Affirmed in part, vacated in part, and remanded by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge WILLIAMS joined. Judge LEE wrote an opinion concurring in part and dissenting in part.
OPINION
TRAXLER, Circuit Judge:
Howard Kevin Knussman, a trooper in the Maryland State Police, brought an action alleging that the State of Maryland and several individual employees of the Maryland State Police (collectively “the defendants”) unlawfully discriminated against him on the basis of his gender, for which he sought recourse under 42 U.S.C.A. § 1983 (West Supp.2000); and that the defendants violated his rights under the Family and Medical Leave Act of 1993 (FMLA), see 29 U.S.C.A. §§ 2601-2654 (West 1999), for which he sought recourse under § 1983 and directly under the FMLA. Following a jury trial and various post-trial motions, judgment in the amount of $375,000 was entered against only one of the defendants — Jill Mulli-neaux, a civilian employee of the Maryland State Police.
On appeal, Mullineaux contends that she was entitled to qualified immunity. Alternatively, she challenges the verdict on several grounds. We conclude that Mullineaux was not entitled to qualified immunity; however, we find that the award of damages was excessive. Accordingly, we set aside the jury’s award of damages and remand for further proceedings on that issue.
*628 I.
In 1994, Knussman learned that his wife Kimberly was pregnant. At the time, Knussman held the rank of trooper first class and served as a paramedic on mede-vac helicopters in the Aviation Division, of the Maryland State Police (“MSP”)- Unfortunately, Kim’s pregnancy was difficult and ultimately resulted in her confinement to bed rest in the latter stages prior to delivery. In October 1994, Knussman submitted a written request to his supervisor asking that Knussman be permitted to take four to eight weeks of paid “family sick leave” to care for his wife and spend time with his family following the birth of his child.[1] J.A. 121. Eventually, Knuss-man was informed by the MSP Director of Flight Operations, First Sergeant Ronnie P. Creel, that there was “no way” that he would be allowed more than two weeks. Creel testified that, at the time of Knuss-man’s request, the Aviation Division was understaffed. According to Knussman, Creel misinformed him that if he wanted more leave, he would be forced to take unpaid leave because the FMLA did not entitle him to further paid leave. Knuss-man testified that he was unfamiliar with the FMLA because the MSP had failed to provide proper notice to its employees about their rights under the FMLA.
In early December, shortly before the Knussmans’ daughter was born, Jill Mulli-neaux, manager of the medical leave and benefit section of the MSP Personnel Management Division, notified all MSP employees of a new Maryland statutory provision that allowed the use of paid sick leave by a state employee to care for a newborn. See Md.Code Ann., State Pers. & Pens. §§ 7-502(b)(3), 7-508 (1994). The statute permitted “[pjrimary care givers” to “use, without certification of illness or disability, up to 30 days of accrued sick leave to care for [a] child ... immediately following: ... the birth of the employee’s child.” Md.Code Ann., State Pers. & Pens. § 7-508(a)(1). A “[pjrimary care giver” was defined as “an employee who is primarily responsible for the care and nurturing of a child.” Md.Code Ann., State Pers. & Pens. § 7-508(a)(l). By contrast, a “[s]ec-ondary care giver,” i.e., “an employee who is secondarily responsible for the care and nurturing of a child,” might use up to 10 days of accrued sick leave without providing proof of illness or disability. Md.Code Ann., State Pers. & Pens. § 7-508(b)(l).[2] In contrast to “family sick leave,” which required an employee to provide verification of a family member’s illness, the new “nurturing leave” provision permitted an employee to use paid sick leave without providing any medical documentation, since this type of leave was not actually related to the illness or disability of the employee or the employee’s family.[3]
Believing that this “nurturing leave” might afford him more paid leave than he would receive from his request for “family *629 sick leave,” Knussman contacted Mulli-neaux for additional information about using his accrued sick leave under § 7-508. Specifically, he wanted to know whether he could qualify as a primary care giver under § 7 — 508(a)(1) and take 30 days of paid sick leave. According to Knussman, Mulli-neaux informed him that only birth mothers could qualify as primary care givers; fathers would only be permitted to take leave as secondary care givers since they “couldn’t breast feed a baby.” J.A. 136. Mullineaux, who testified that she was merely passing' along the Maryland Department of Personnel’s (DOP) view of “primary care giver,” denied adopting such a categorical interpretation.[4] In any case, Knussman’s superior officers in the Aviation Division, having consulted Mullineaux about the untested nurturing leave provision, granted him 10 days of paid sick leave as the secondary care giver under § 7 — 508(b).
The Knussmans’ daughter was born on December 9, 1994. Kimberly Knussman, however, continued to experience health problems. Before his authorized 10-day leave expired, Knussman contacted Sergeant J.C. Collins, one of his supervisors, and inquired whether his status could be changed to that of primary care giver and his paid sick leave extended to 30 days under section 7-508(a). Knussman explained to Collins that he was the primary care giver for the child because, given his wife’s condition following delivery, he was performing the majority of the essential functions such as diaper changing, feeding, bathing and taking the child to the doctor.
David Czorapinski, the Assistant Commander for the Aviation Division during this time, learned of Knussman’s inquiry and, unable to reach Mullineaux, gathered some preliminary information on the new law himself. Czorapinski learned that the Maryland DOP intended to take the position that the mother was the primary care giver and the father was secondary. Czo-rapinski passed this information down the chain-of-command and Knussman was told that it was unlikely that his paid sick leave would be extended under section 7-508(a).
On the day before Knussman was scheduled to return to work, Knussman made a final attempt at obtaining additional sick leave. Sergeant Carl Lee, one of Knuss-man’s immediate superiors, had earlier informed Knussman that although nurturing leave as a primary care giver was probably not an option, Knussman might be eligible for additional paid leave under the family sick leave provision, see Md.Code Ann., State Pets. & Pens. § 7 — 502(b)(2), as long as he could demonstrate that it was medically necessary for him to care for his wife. Knussman contacted Mullineaux to find out what information he needed to supply for family sick leave.[5] During this conversation, Knussman again discussed his eligibility for nurturing leave as a primary care provider under section 7-508(a) with Mulli-neaux, who explained that “God made *630 women to have babies and, unless [he] could have a baby, there is no way [he] could be primary care [giver],” J.A. 153, and that his wife had to be “in a coma or dead,” J.A. 154, for Knussman to qualify as the primary care giver.
Mullineaux denied Knussman’s request for paid sick leave under § 7-508(a) as a primary care giver. Knussman returned to work as ordered and immediately filed an administrative grievance on the grounds that he had been improperly denied primary care giver status under § 7-508(a). He did not seek review of Mulli-neaux’s denial of his request for family sick leave under section 7-502(b)(2). Once the grievance process was underway, Knussman’s claim went up the MSP chain-of-command and Mullineaux’s involvement ceased.
Knussman’s grievance was denied at each stage of the four-level grievance procedure. By the time Knussman reached step two, which consisted of a review conference held by Knussman’s Assistant Commanding Officer Czorapinski, the MSP apparently had retreated from Mulli-neaux’s earlier, categorical classification of mothers as primary care givers and fathers as secondary providers. Czorapinski testified that prior to the grievance conference, he notified Knussman that the DOP had “recanted [its] policy [that] mother’s primary, father’s secondary,” J.A. 840, and that Knussman was indeed eligible for primary care giver status and could qualify by providing “some information on why you are the primary caregiver.” J.A. 841. And, Knussman acknowledged that Czora-pinski explained that he would be trying to determine during the step two grievance conference whether Knussman was the primary care giver. Also, Czorapinski’s later written ruling explained that “the overall issue of primary v. secondary was still a matter to be resolved in [Knuss-man’s] case” and that Knussman was told to “be prepared to establish himself as primary care giver at the conference.” J.A. 1208. Thus, Czorapinski, interpreting the statute to permit only one primary care giver, offered Knussman the opportunity to demonstrate that he was that person.
After a formal conference with Knuss-man and his lawyer, Czorapinski denied Knussman’s grievance, reasoning that Knussman failed to present enough evidence to support his claim of primary status:
The grievance filed by Tfc. Knussman states that Mrs. Knussman had medical complications during and after pregnancy that necessitated him to assume primary child care responsibilities. [The documents] presented to verify this necessity fail to make any argument in that regard....
All indications are that Mrs. Knuss-man was capable of providing for the care and nurturing of their child after birth. She was off on maternity leave from December 9, 1994 when the child was born until January 23, 1995 when she was certified fit for full time work, a period equivalent to the 30 days allowed by the statute involved in this matter. Additionally, there was nothing offered to indicate that she was unwilling or otherwise unable to provide care for the child. Basically speaking, she was receiving all of the benefits afforded by statute.
Taking into consideration all of these facts, Mrs. Knussman has to be identified as the primary care giver in this instance. Tfc. Knussman has not shown any difference between himself and Mrs. Knussman in skill, talent or ability in providing care and nurturing for the child. Since Mrs. Knussman was already receiving benefits equal to those specified for primary care givers according to statute, there is no reason to *631 extend similar primary care benefitsfto] Tfc. Knussman. He was afforded benefits of [a] secondary care provider as he was rightfully entitled. While Tfc. Knussman may have desired the designation as primary, he has failed to justify that claim.
J.A. 1209-10. Essentially, Czorapinski believed that Kimberly Knussman, who was also a state employee, was enjoying the benefits of nurturing leave as a primary care giver because, following delivery, she took sick leave for a 30-day period — the same amount of time afforded a primary care giver under § 7-508(a). Thus, Czora-pinski was concerned that both Knussmans were attempting to qualify as the primary care giver for their daughter when the statute indicated only one person could qualify. At trial, Knussman presented evidence that, prior to the step two grievance conference, Mullineaux and Czorapinski were made aware of the fact the Kimberly Knussman was, in fact, on sick leave for her own disability resulting from the difficult pregnancy. Following Czorapinski’s decision, Knussman pursued his complaint through the two remaining steps of the internal grievance procedure without success.
Knussman then filed a three-count action in federal court. In Count I, Knuss-man sought relief under § 1983, claiming that his leave request under § 7-508(a) was denied as a result of gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In Count II, Knussman asserted that the denial of his request for additional paid leave violated the FMLA. See 29 U.S.C.A. § 2612(d)(2)(A) (“An eligible employee may elect ... to substitute any of the accrued paid ... personal leave, or family leave of the employee for leave provided under [the FMLA] for any part of the 12-week period of such leave.... ”). Knuss-man brought Count II directly under the FMLA as well as under § 1983. Third, Knussman asserted a claim under the Maryland Equal Rights Amendment but subsequently agreed to dismiss it. He named as defendants the State of Maryland, the MSP, and several employees of the MSP, in both their individual and official capacities: Mullineaux, Czorapinski, Creel, and Colonel David B. Mitchell, Superintendent of the MSP.
Initially, the defendants moved to dismiss Counts I and II on the grounds that the Eleventh Amendment afforded immunity -from suit to the State of Maryland, the MSP, and the individual defendants in their official capacities. The district court dismissed Knussman’s § 1983 equal protection claim under Count I as to the State of Maryland, the MSP, and the individual defendants in their official capacities to the extent the claims sought money damages. See Knussman v. State of Maryland, 935 F.Supp. 659, 663-64 (D.Md.1996). The district court denied the motion to dismiss with respect to Knussman’s claims under Count II that the defendants violated the FMLA. See id. at 664.
After a period of discovery, the defendants moved for summary judgment on the grounds that they were entitled to qualified immunity and that Knussman could not prove an equal protection violation in the first place. With respect to Knussman’s equal protection claim under § 1983 (Count I), the court concluded that the facts, viewed in the light most favorable to Knussman, indicated that the defendants applied a gender-based presumption that the birth mother was the primary care giver, which would amount to an equal protection violation. See Knussman v. State of Maryland, 16 F.Supp.2d 601, 611-12 (D.Md.1998) (“Knussman II”). The district court further concluded that the defendants were not entitled to qualified immunity because it was well-established at the time that gender discrimina *632 tion in employment was prohibited under the Fourteenth Amendment:
Although the Maryland leave law had been amended effective less than one month before [Knussman] requested leave and the DOP had not issued any guidelines regarding application of the amended law, the right to equal protection is a well-established principle. It is also clear that gender discrimination violates the equal protection clause. Discriminatory application of a gender neutral state law is patently illegal and defendants should have known at least this much.
Id. at 612. As for the FMLA claims (Count II), however, the district court granted qualified immunity to all of the individual defendants in their individual capacities. See id. at 611.
Thus, the case went to trial on portions of both counts in the complaint. As for Count I, Knussman’s § 1983 equal protection claim remained intact against the State of Maryland (but only for declaratory and injunctive relief) and the defendants in their individual capacities. At the close of the evidence, the court submitted the question of qualified immunity to the jury as well as the ultimate question of liability. The jury concluded that each defendant denied Knussman’s request for leave because of his gender; however, the jury also found that every defendant except Mullineaux was entitled to qualified immunity. Knussman does not challenge this conclusion on appeal. On Count II, the FMLA claim brought under both the FMLA and § 1983 against the State of Maryland and the defendants in their official capacities, the jury concluded that all of the defendants denied Knussman leave to which he was entitled under the FMLA. The jury awarded Knussman the sum of $375,000 in damages.
The defendants moved for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, alternatively, for a new trial under Rule 59(a). See Knussman v. State of Maryland, 65 F.Supp.2d 353, 354 (D.Md.1999) (“Knussman III ”). The district court rejected Mullineaux’s renewed argument that she was entitled to qualified immunity:
The Court finds no reason to disturb the jury’s findings in this regard. A jury could have reasonably concluded from the evidence that Mullineaux, as the personnel officer in the State’s Personnel Management Division, should have recognized that she was applying a gender neutral leave statute in a discriminatory manner by making only men prove they are primary care givers to a newborn or adopted child.
Knussman III, 65 F.Supp.2d at 360.
The defendants also raised various challenges to the damages awarded by the jury on Count II, the FMLA claim. Ultimately, the district court vacated the jury’s verdict on Count II and “amend[ed] the judgment to remove the State and the individual defendants in their official capacities from liability for money damages.” Id. at 360. Thus, Mullineaux became the only defendant subject to monetary liability. She argued that the $375,000 award of damages was excessive. The district court rejected this argument, concluding there was sufficient evidence for the jury to conclude that Knussman suffered significant emotional damage. See id.
On appeal, Mullineaux contends that she was entitled to qualified immunity on Knussman’s equal protection claim under § 1983. She also challenges, on multiple grounds, the jury’s verdict as well as the court’s jury instructions.[6]
*633 II.
First, we turn to defendant Mullineaux’s argument that she was entitled to qualified immunity from Knussman’s claims. Public officials “are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach ‘clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir.1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). “The reasonableness inquiry is an objective one, measured by reference to clearly established law.” Milstead v. Kibler, 243 F.3d 157, 161 (4th Cir.2001) (internal quotation marks omitted). Essentially, officials
performing a discretionary function enjoy an immunity that shields them from liability for civil damages unless (1) the officers’ conduct violates a federal statutory or constitutional right, and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right.
Id.; see Anderson v. Creighton, 483 U.S. 635, 638-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), instructs that “[a] court evaluating a claim of qualified immunity ‘must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.’ ” Id. at 609, 119 S.Ct. 1692 (emphasis added) (quoting Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). “Were courts to rule on qualified immunity without determining the constitutionality of the challenged conduct, ‘standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional.’ ” Kibler, 243 F.3d at 162 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).
The initial question, therefore, is whether a violation of a constitutional right has been demonstrated. See Wilson, 526 U.S. at 609, 119 S.Ct. 1692. “If so, we may proceed to determine whether [the official] is entitled to qualified immunity or whether, because he ran afoul of clearly established constitutional rights, he is to be held personally accountable for his unlawful conduct.” Doe v. Broderick, 225 F.3d 440, 446 (4th Cir.2000).
Mullineaux moved for qualified immunity at the summary judgment stage under Rule 56 of the Federal Rules of Civil Procedure. The district court denied the motion. See Knussman II, 16 F.Supp.2d at 612. The case proceeded to trial and the district court submitted the question of qualified immunity to the jury. With regard to the question of whether Knussman established a constitutional violation, the court instructed the jury that “[t]he government and its officials may employ a sex-based classification or policy only if they can demonstrate an exceedingly per *634 suasive justification for the policy and can show that the discriminatory classification is substantially related to the achievement of governmental objectives.” J.A. 1091— 92. The jury was further instructed that “[wjhere a law is gender neutral on its face, discriminatory application of that law is unconstitutional.” J.A. 1092. The district court then explained that even if the jury were to conclude that the defendants discriminated based on gender, the defendants could escape liability if they were entitled to qualified immunity, ie., “if at the time [they] discriminated based on gender [they] neither knew nor should have known that [their] actions were contrary to federal law.” J.A. 1092. The jury was told that at the time in question, it was clearly established federal law that “gender discrimination violates the equal protection clause.” J.A. 1092. The jury concluded that all of the individual defendants except Mullineaux were entitled to qualified immunity.
Mullineaux renewed her motion at the post-verdict stage under Rule 50(b). The district judge, in reviewing the Rule 50(b) motion, refused to disturb the jury’s determination that Mullineaux was not entitled to qualified immunity. See Knussman III, 65 F.Supp.2d at 360-61. Ultimately, it is this decision that we are reviewing. On appeal, we consider the district court’s ruling on the Rule 50(b) motion in light of the full trial record rather than the court’s denial of summary judgment under Rule 56(c) on less than a full record. See Chesapeake Paper Prods. Co. v. Stone & Webster Eng’g Corp., 51 F.3d 1229, 1286-37 (4th Cir.1995). Our review of the district court’s denial of Mulli-neaux’s Rule 50(b) motion is de novo, and we view the evidence in the light most favorable to Knussman. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir.1999).
Before turning to our analysis of whether Mullineaux is entitled to qualified immunity, we pause to note that, although the jury may be suited for making factual findings relevant to the question of qualified immunity, we believe it is far better for the court, not the jury, to answer the ultimate legal question of whether a defendant is entitled to qualified immunity. See Warren v. Dwyer, 906 F.2d 70, 76 (2nd Cir.1990) (“The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.”). The nature of the analysis—requiring an examination of current federal law and federal law as it existed at the time of the alleged violation—makes for an awkward determination by the jury, at best. But, since the issue has not been raised, we will leave for another day the question of whether it is ever appropriate for a jury to answer the ultimate legal question of a defendant’s entitlement to qualified immunity.
A.
We first consider the issue of whether the evidence adduced at trial is sufficient to establish that Mullineaux committed a constitutional violation under the law as it currently stands. In a nutshell, Knussman’s contention is that Mullineaux applied a facially neutral statute unequally solely on the basis of a gender stereotype in violation of the Equal Protection Clause of the Fourteenth Amendment. The only distinction created by the statute was between “primary care givers” and “secondary care givers,” the former being entitled to 30 days of accrued sick leave to care for a newborn and the latter being entitled to 10 days of accrued sick leave. See Md. Code Ann., State Pers. & Pens. § 7-508. The statute made no reference to gender. Rather, the gender classification was created in the application of § 7-508. Viewed *635 in the light most favorable to Knussman, Mullineaux, based on the comments of an administrative assistant to the DOP’s Director of Legislation, took the position that only mothers could qualify for additional paid leave as primary care givers under § 7-508(a). Essentially, Mullineaux applied an irrebutable presumption that the mother is the primary care giver, and therefore entitled to greater employment benefits.[7]
We agree with Knussman that Mullineaux’s conduct violated his rights under the Equal Protection Clause. Government classifications drawn on the basis of gender have been viewed with suspicion for three decades, beginning with the Supreme Court’s decision in Reed v. Reed, 404 U.S. 71, 77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), in which the Court condemned “dissimilar treatment for men and women who are ... similarly situated.” As its equal protection jurisprudence developed in subsequent cases, the Court did not view gender classifications as “benign”:
[SJince sex, hke race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate “the basic concept of our system that legal burdens should bear some relationship to individual responsibility....” And what differentiates sex from such non-suspect [classifications] as intelligence or physical disabihty ... is that the sex characteristics frequently bears no relation to ability to perform or contribute to society.
Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (first ellipsis in original) (citation omitted); see United States v. Virginia, 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (“VMI”) (“Since Reed, the Court has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature.... ”). Thus, a gender classification is subject to heightened scrutiny and will fail unless it “serve[s] important governmental objectives and [is] substantially related to achievement of those objectives.” Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); see Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); see also Mitchell v. Commissioner of the Social Security Administration, 182 F.3d 272, 274 (4th Cir.) (“[Cjertain quasi-suspect classifications, such as gender and illegitimacy, are subject to an intermediate form of scrutiny and will be upheld if ‘substantially related to a sufficiently important governmental interest.’ ”) (quoting City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1996)), cert. denied, 528 U.S. 944, 120 S.Ct. 358, 145 L.Ed.2d 280 (1999).
In particular, justifications for gender-based distinctions that are rooted in “overbroad generalizations about the different talents, capacities, or preferences of males and females” will not suffice. VMI, 518 U.S. at 533, 116 S.Ct. 2264. “Legislative classifications which distribute benefits and burdens on the basis of gender *636 carry the inherent risk of reinforcing stereotypes about the ‘proper place’ of women and their need for special protection.” Orr v. Orr, 440 U.S. 268, 283, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). Thus, gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court. For example, in Frontiero, the Supreme Court invalidated a federal statute that permitted a male member of the uniformed services automatically to claim his wife, for purposes of obtaining additional benefits, as a dependent, but precluded a female member from so claiming her husband unless she could demonstrate that he was, in fact, dependent upon her for more than half of his support. See 411 U.S. at 678-79, 93 S.Ct. 1764. The Court concluded that the purported reason for the different treatment of males and females, administrative convenience, was premised on the imper-missibly broad assumption that wives are dependent upon their husbands for support. See id. at 689, 93 S.Ct. 1764 (rejecting the Government’s argument “that Congress might reasonably have concluded that it would be both cheaper and easier simply conclusively to presume that wives of male members are financially dependent upon their husbands”). In Wengler, the Supreme Court struck down a Missouri workers’ compensation provision that automatically paid death benefits to a widow but required a widower to demonstrate that he was actually dependent on his wife’s earnings or that he was mentally or physically incapacitated. The Wengler Court again rejected the stereotypical justification offered for treating males and females differently — “that most women are dependent on male wage earners and that it is more efficient to presume dependency in the case of women than to engage in case-to-case determination^].” 446 U.S. at 151, 100 S.Ct. 1540. And, in Weinberger v. Wiesenfeld, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Supreme Court invalidated a provision of the Social Security Act that paid benefits to a widow and her minor children based on her deceased husband’s earnings but, in the case of a deceased wife, provided benefits only to the minor children and not the widower. See id. at 637-39, 95 S.Ct. 1225. The section of the Social Security Act at issue there was premised upon “the notion that men are more likely than women to be the primary supporters of their spouses and children.” Id. at 645, 95 S.Ct. 1225; see also Califano v. Goldfarb, 430 U.S. 199, 201-02, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (invalidating Social Security provision requiring a widower, but not a widow, to prove dependency); Orr, 440 U.S. at 280-83, 99 S.Ct. 1102 (holding unconstitutional an Alabama statute making alimony available to wives only).
Gender classifications based upon generalizations about typical gender roles in the raising and nurturing of children have met a similar fate. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court determined that an Illinois statute was infirm under equal protection principles where unmarried fathers were presumed to be unfit to raise their children but married mothers (as well as married fathers) were presumed fit, meaning that “the children of unwed fathers [became] wards of the State upon the death of the mother.” Id. at 646, 92 S.Ct. 1208. The Court determined that “all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody” and that denying a hearing to unwed fathers while granting it to unwed mothers (and married fathers) “is inescapably contrary to the Equal Protection Clause.” Id. at 658, 92 S.Ct. 1208; see also Weinberger, 420 U.S. at 652, 95 S.Ct. 1225 (observing that “a father, no less than a mother, has a *637 constitutionally protected right to the companionship, care, custody, and management of the children” (internal quotation marks omitted)).
In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court specifically rejected the argument that a state can classify based solely upon the idea that the maternal child-raising role is necessarily primary. There, a New York law gave unwed mothers the power to block the adoption of their children, in the majority of cases, by withholding consent; unwed fathers — even those with a substantial relationship with their children — did not enjoy the same power. Thus, the statute in Caban treated unmarried parents differently based on their gender. In holding that the statute did not bear a substantial relation to an important governmental interest, the Court rejected the argument that “the distinction is justified by a fundamental difference between maternal and paternal relations— that ‘a natural mother, absent special circumstances, bears a closer relationship with her child ... than a father does.’ ” Id. at 388, 99 S.Ct. 1760 (ellipsis in original). The Caban Court observed that “[cjontrary to appellees’ argument and to the apparent presumption underlying [the New York statute], maternal and paternal roles are not invariably different in importance” and thus “reject[ed] ... the claim that the broad, gender-based distinction of [the statute] is required by any universal difference between maternal and paternal relations at every phase of a child’s development.” Id. at 389, 99 S.Ct. 1760.
The defendants have not even attempted to explain how an irrebuttable presumption in favor of the mother under § 7-508 relates to an important state interest. We conclude that the presumption employed by Mullineaux here was not substantially related to an important governmental interest and, therefore, was not permissible under the Equal Protection Clause.[8]
B.
We next must decide whether Mulli-neaux’s actions contravened “clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). “Clearly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Wilson, 526 U.S. at 614-15, 119 S.Ct. 1692 (alterations and internal quotation marks omitted). Although it is not required that the exact action at issue has been previously determined to be unlawful, “in the light of pre-existing law the unlawfulness must be apparent.” Id. at 615, 119 S.Ct. 1692 (internal quotation marks omitted); Saucier, 121 S.Ct. at 2156. Wilson reiterated that “the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.” Id. Therefore, *638 our analysis of whether the constitutional right at issue was clearly established must proceed “at a high level of particularity.” Edwards v. City of Goldsboro, 178 F.3d 231, 250-51 (4th Cir.1999).[9]
We view the relevant constitutional question as follows: was the law clearly established in December 1994 that the equal protection clause prohibited a state agency from permitting only mothers, never fathers, to take child-nurturing leave benefits available to the primary care giver for a newborn? We think the decisions outlined above demonstrate that it was.
Mullineaux contends that the law was not clear because the Supreme Court had determined on a number of occasions that equal protection principles permit government officials to distribute employment-related benefits pursuant to gender-based classifications. In the decisions cited by Mullineaux, however, the gender-based classification was linked to something other than a sexual stereotype. For example, Mullineaux relies on Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In our view, Geduldig does not cloud the issue. In Geduldig, the Court upheld a California insurance statute that excluded pregnancy-related disabilities from coverage against an equal protection challenge, observing that the exclusion of disabilities relating to normal childbirth (as well as other short-term disabilities not related to pregnancy) represented a permissible policy choice aimed at maintaining the solvency of the insurance program. See id. at 494-97, 94 S.Ct. 2485. Geduldig distinguished the Frontiero line of decisions:
The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition — pregnancy — from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in Reed ... and Frontiero .... Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.
Id. at 496 n. 20, 94 S.Ct. 2485. Likewise, Mullineaux’s reliance on decisions such as Califano v. Webster, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (per curiam), is unavailing. In Webster, the Court approved a provision of the Social Security Act that afforded women a more favorable *639 method of calculating “old-age insurance benefits” than for similarly situated males, see id. at 314-16, 97 S.Ct. 1192, because Congress aimed the statute at reducing “the disparity in economic condition between men and women caused by the long history of discrimination,” id. at 317, 97 S.Ct. 1192. Thus, the statute’s disparate treatment of men and women “was not the accidental byproduct of a traditional way of thinking about females.” Id. at 320, 97 S.Ct. 1192 (internal quotation marks omitted).
The authority cited by Mullineaux actually underscores our conclusion regarding the clarity of the law in December 1994. Mullineaux’s distribution of sick leave benefits under § 7-508 was a by-product of traditional ideas about a woman’s role in rearing a child, which was clearly impermissible under the Equal Protection Clause of the Fourteenth Amendment at the time in question.
Accordingly, we affirm the denial of qualified immunity to Mullineaux and the •jury’s verdict with respect to liability. Given our finding in this regard, we need not consider the effect of the overly broad definition of the constitutional right contained in the jury instructions.
III.
Mullineaux seeks a new trial on damages, raising several challenges to the jury’s award of $375,000. Mullineaux’s principal argument is that the verdict was excessive and that the district court erred in refusing to grant a new trial on this basis. See Knussman III, 65 F.Supp.2d at 360. We review a district court’s denial of a Rule 59 motion for a new trial for abuse of discretion. See Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998). On a Rule 59 motion, the district court must
set aside the verdict and grant a new trial[ ] if ... (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.
Atlas Food Sys. & Servs., Inc. v. Crane Nat’l Vendors, Inc., 99 F.3d 587, 594 (4th Cir.1996) (quoting Aetna Casualty & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir.1941)). On an excessiveness challenge, we review a jury’s determination of the amount of compensatory damages under the first two prongs of the Rule 59 standard: “ ‘whether the jury’s verdict is against the weight of the evidence or based on evidence which is false.’ ” Cline, 144 F.3d at 305 (quoting Atlas Food, 99 F.3d at 594).
Knussman sought damages solely for emotional distress that he claimed to have suffered because of Mullineaux’s actions. He did not suffer any direct pecuniary harms such as loss of income. Compensatory damages for emotional injuries are recoverable under § 1983. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (“[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation ..., personal humiliation, and mental anguish and suffering.” (internal quotation marks omitted) (ellipsis in original)); Carey v. Piphus, 435 U.S. 247, 263-64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Damages under § 1983 are intended to compensate for actual injuries caused by constitutional violations; therefore, a § 1983 plaintiff alleging emotional distress must demonstrate that the emotional duress resulted from the constitutional violation itself. See Carey, 435 U.S. at 263, 98 S.Ct. 1042. The plaintiff must adduce sufficient evidence “that such distress did in fact *640 occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes.” Price v. City of Charlotte, North Carolina, 93 F.3d 1241, 1250 (4th Cir.1996); see Hetzel v. County of Prince William, 89 F.3d 169, 171-72 (4th Cir.1996) (concluding compensatory damages award on a retaliation claim under § 1983 was excessive because “only a part of Hetzel’s harms[were] properly attributed to appellants’ retaliatory actions. Much, if not all, of Hetzel’s claimed distress was actually caused by her erroneous belief that she was the victim of invidious discrimination, and of course, given the jury’s findings for the defendants on all of Hetzel’s claims of discrimination, Hetzel is entitled to no damages for any injuries which were caused by her belief that she was [discriminated against]” (emphasis in original)). A plaintiff seeking compensatory damages for emotional injuries cannot rely on “conclusory statements that the plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred,” but, rather, “the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated.” Price, 93 F.3d at 1254.
In determining whether an award of damages for emotional distress for a constitutional deprivation is excessive, an appellate court may look to a number of factors: medical attention resulting from the emotional duress; psychiatric or psychological treatment; the degree of such mental distress; the factual context in which the emotional distress developed; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; mitigating circumstances, if any; physical injuries suffered as a result of emotional distress; and loss of income, if any. See id. A substantial award of compensatory damages like Knussman’s “must be proportional to the actual injury incurred” and “must focus on the real injury sustained.” Hetzel, 89 F.3d at 173 (internal quotation marks omitted).
Knussman presented sufficient evidence for the jury to conclude that the emotional distress and mental anxiety he experienced was a genuine injury resulting, at least to some extent, from Mullineaux’s equal protection violation. Knussman testified that he was “particularly disgusted” with Mullineaux’s comments that Knussman could not qualify for primary care giver status because he could not breast feed and that Kimberly Knussman would have to die or slip into a coma for him to become eligible. He indicated that in March 1995 — approximately one month before Knussman initiated this lawsuit — he began experiencing anxiety and losing sleep as a result of “the comments by Miss Mullineaux” as well as the commencement of the internal grievance process. J.A. 196. According to Knussman, by the fall of 1996, his anxiety had begun to manifest itself as “chest pain” and “palpitations,” and he decided to seek professional help. He was eventually prescribed medication to manage his symptoms of depression. Moreover, Knussman presented medical evidence to corroborate his testimony that he was experiencing emotional distress. Dr. Susan Toler, a clinical psychologist who treated Knussman, testified that by 1996, Knussman was frequently experiencing “panic attack[s],” J.A. 548, which Dr. Toler attributed to Knussman’s “dispute with his employer over leave.” J.A. 550. Dr. Toler diagnosed Knussman with “major depressive disorder,” J.A. 560, and occupation-related “adjustment disorder,” J.A. 561. Dr. Lydia Wenz, a treating psychiatrist, concurred in the diagnosis of major depressive disorder. Thus, Knussman was entitled to recover some amount of compensatory damages for emotional distress.
*641 The nexus, however, between Mullineaux’s unconstitutional conduct and Knussman’s emotional injuries is attenuated, and this is a factor for us to consider in assessing whether Knussman’s award for emotional distress is excessive. See Price, 93 F.3d at 1254.[10] Mullineaux abridged Knussman’s constitutional rights by denying him the same opportunity to qualify for primary care giver status as would be afforded a mother. Mullineaux’s role, however, was limited to the initial denial of Knussman’s request for primary care giver status under § 7-508. Once the internal grievance process was underway, Mullineaux’s involvement ceased.
Furthermore, the evidence linked a large portion of Knussman’s emotional difficulties to the litigation of this action and, to some extent, the general MSP “grievance process” rather than Mullineaux’s unconstitutional conduct. Dr. Toler explained that Knussman began experiencing physical symptoms related to anxiety as a result of the “tensions that were building between himself and his employer over ... this request for child leave, and then that he had appealed the decision, and ... there was a series of administrative procedures that he became involved with and around appeals or grievances or whatever.” J.A. 550. Dr. Toler opined that following the original leave denial, Knussman began feeling anxiety and stress that increased at every stage of the internal grievance procedure and the litigation process. The litigation of Knussman’s claims “magnified the conflicts with the employer, and ... directly impacted his sleep,” J.A. 558, and intensified “the adversarial relationship that had evolved and developed over the course of the years,” J.A. 571. Dr. Toler acknowledged that Knussman’s symptoms of anxiety “elevate[d] during periods of more activity in the litigation” and “dissipated during periods of low activity in the litigation.” J.A. 588. According to Dr. Toler, Knussman’s depressive symptoms — his sleeplessness, inability to concentrate and lack of zest for life — were not alleviated when he was granted leave for the birth of his second child “because, by that time, the litigation was well under way and there were a lot of activities around the first grievance and complaint that continued to wear on him.” J.A. 580. And, Dr. Toler’s treatment plan included a recommendation that Knussman resolve the litigation. Dr. Wenz recommended a similar course.[11]
Indeed, any anxiety, stress or other unpleasantness that Knussman experienced as a by-product of litigation or the grievance process was not caused by “the constitutional deprivation itself.” Price, 93 F.3d at 1250. Such mental distress is “inherent in most litigation” and although “[i]t can be argued that [Knussman] should not have been placed in a position where [he] had to assert[his] rights, ... the same can be said of the successful plaintiff in any case.” School Dist. No. 1, Multnomah County v. Nilsen, 271 Or. 461, 534 *642 P.2d 1135, 1146 (1975) (emphasis added). Generally speaking, litigation-induced emotional distress is never a compensable element of damages. See, e.g., Stoleson v. United States, 708 F.2d 1217, 1223 (7th Cir.1983) (“It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfea-sor should have the right to defend himself in court without thereby multiplying his damages....”); Blakey v. Continental Airlines, Inc., 992 F.Supp. 731, 736 n. 3 (D.N.J.1998); Picogna v. Board of Educ., 143 N.J. 391, 671 A.2d 1035, 1038-39 (1996) (collecting cases).
Clearly, Knussman’s anxiety and emotional distress in large measure were associated with the litigation of this action or the general grievance process as opposed to the specific constitutional violation at issue. Apart from this litigation-related stress, Knussman’s evidence of emotional distress is insufficient to support an award of $375,000. Although Knussman unquestionably suffered real emotional problems, it is clear that much of his genuine emotional distress resulted from or was exacerbated by the litigation process. We conclude the award of $375,000 is not proportional to the emotional distress caused by the constitutional violation, as opposed to the litigation of Knussman’s claims, and is clearly against the weight of the evidence. Because it is not possible to determine what portion of the verdict was intended to compensate Knussman for the emotional damages attendant only to the litigation process, a new trial on damages is more appropriate than a new trial nisi remittitur. See Cline, 144 F.3d at 305 (“[W]e have the option of ordering a new trial nisi remittitur.”).[12]
IV.
In sum, we hold that Mullineaux was not entitled to qualified immunity against Knussman’s equal protection claim under § 1983 and affirm the judgment as to liability, but we conclude that the jury’s award of $375,000 was excessive. Accordingly, we vacate the jury’s award and remand for a new trial on damages with respect to Knussman’s equal protection claim (Count I). Knussman is entitled to be compensated for emotional distress caused by Mullineaux’s constitutional violation but not for any emotional distress associated with the litigation of this action or his employer’s general internal grievance process.[13]

*643
AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. Maryland law permitted a state employee to use paid sick leave Cor reasons other than the employee’s own illness, including “for death, illness, or disability in the employee's immediate family.” Md.Code Ann., State Pers. & Pens. § "7 — 502(b)(2) (1994). The statute was later amended and reorganized; however, Maryland law still permits this particular use of a state employee’s sick leave. See Md.Code Ann., State Pers. & Pens. § 9-501(b)(2) (1996).

. Section 7-508 has been amended and reco-dified, and it now provides for the use of up to an aggregate of 40 days of accrued sick leave if two state employees are responsible for the care of a newborn. See Md.Code Ann., State Pers. & Pens. § 9 — 505(b)(1) (1996). Section 7-508(b)(l), had it been in effect at die time, apparently would have applied to the Knussmans, who were both state employees.

.For ease of reference, we adopt the term "nurturing leave.” This term, however, does not appear in the statute.

. Mullineaux testified that she never told Knussman that fathers were, as a class, ineligible for primary care giver status. Rather, Mullineaux's version was that she told Knuss-man, based on information provided by the state Department of Personnel, "that the birth mother was presumed to be the primary care giver and if he wanted to qualify as the primary care giver, he could, if he could provide [supporting] information.” J.A. 488.

. Knussman subsequently submitted a letter from Kimberly Knussman’s doctor in support of his request for family sick leave; however, Mullineaux concluded that the letter was insufficient to justify family sick leave because “it [did not] say what care [Knussman was] going to provide, and it [did not] say that [Knussman] need[ed] to be home ... like it's [Knussman s] choice and not the doctor's requirement.” J.A. 827. Although Czorapinski suggested to Knussman that the deficiencies could be easily corrected, Knussman refused "to pursue this option any further.” J.A. 828.

. We need not address whether the Eleventh Amendment permits Knussman to bring an *633 FMLA claim against the States and the defendants in their official capacities. The district court vacated the jury's verdict on Count II and Knussman has not appealed that decision. In light of our disposition of this appeal, there is no need to determine whether the submission of the FMLA claim to the jury tainted the verdict, and hence no need to examine the viability of Knussman’s FMLA claim.

. The fact that Mullineaux told Knussman that he would be eligible for primary care giver status if his wife were "in a coma or dead” is of no moment. That was the same as telling Knussman he could never qualify. If Knussman is given the benefit of the doubt, the evidence establishes that Mullineaux categorically denied fathers eligibility for primary care giver status. Thus, it is unnecessary for us to decide whether Mullineaux could have constitutionally applied a truly rebuttable presumption in favor of the mother.

. We agree with the concurring opinion to the extent that it highlights the general proposition that the discriminatory application of a statute that is neutral on its face violates the Equal Protection Clause. See Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818-19 (4th Cir.1995). Respectfully, however, we doubt that we have mischaracterized the nature of the constitutional right at issue by not focusing on the distinction between a gender classification created by legislative enactment and one created by the actions of a single state official. See O'Bar v. Pinion, 953 F.2d 74, 81 (4th Cir.1991) ("When we conduct an equal protection review of the individualized decision of a state official made within his lawful authority, we apply the same analysis as is commonly used in the context of allegedly unlawful legislative decisions.”).

. Here, the concurring opinion departs and would, like the district court, define the right in fairly broad terms: whether "a person’s right not to have a gender neutral statute applied in a discriminatory manner” was clearly established in 1994. Such a broad definition is not faithful to the particularity principle which "mandates that courts refer to concrete applications of abstract concepts to determine whether the right is clearly established.” Amaechi v. West, 237 F.3d 356, 362 (4th Cir.2001). In our view, defining the right so broadly is not too far removed from framing the issue as whether it was clearly established that a person had the right not to be discriminated against based on gender. Such a definition is too general to provide state officials with adequate guidance on the constitutional limits to their conduct. Cf. Wilson, 526 U.S. at 615, 119 S.Ct. 1692 (rejecting the notion that "any violation of the Fourth Amendment [by an officer] is ‘clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of the police.”).

. In reviewing whether the award is excessive, we consider factors that are neither new nor amorphous. Rather, our court listed these general factors in Price. See 93 F.3d at 1254. The strength of the nexus between the defendant’s conduct and the emotional distress suffered is one of the factors to consider — we have not created any new standard. Nor have we suggested that "uncontroverted medical testimony” is legally insufficient to establish causation; indeed, if the evidence was not sufficient to establish causation, then the question would be whether Knussman is entitled to any damages at all. Here, we are only concerned with how much.

. Dr. Wenz's notes indicated that, in addition to psychotherapy and medication, she had "discussed with Mr. Knussman that as he is involved in legal transactions, that until these are resolved, symptoms may persist to some degree. I have encouraged him to discuss this with his legal counsel and pursue rapid resolution.” J.A. 1203.

. In light of our conclusion that the jury’s verdict was excessive, we need not address Mullineaux’s argument that the general verdict rendered by the jury had to be vacated because there was no way to determine what portion of the $375,000 was intended to compensate Knussman on his FMLA claim under Count II, which was subsequently vacated by the district court. Given that Knussman has not appealed the district court's post-trial rulings, the FMLA claim will not be part of the remand proceedings. Thus, any issue involving the effect of the FMLA claims is moot.

. Mullineaux also argues that the district court erred in refusing to instruct the jury under Price v. City of Charlotte that before the jury was permitted to award emotional distress damages for Mullineaux's denial of leave under § 7-508(a), it was required to find specifically that Knussman was entitled to such leave in the first place. See Price, 93 F.3d at 1256. We address this argument to keep it from becoming an issue on remand. Assuming the district court erred in failing to instruct the jury under Price (and Mullineaux has not provided the specific instruction that she believes was required), any error was harmless. The evidence at trial was that Knussman, in fact, performed most if not all of the traditional care functions for his infant daughter and that his wife was home on leave following the delivery as a result of her own disability. Mullineaux has failed to direct us to any substantial evidence to the contrary. Accordingly, the jury could only have concluded that Knussman was entitled to leave under § 7-5 08(a) as a primary care giver.