**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 12-1747**

―――――――――

DUANE MINNICK,

            Plaintiff – Appellant,

        v.

COUNTY OF CURRITUCK; KNOTT'S ISLAND VOLUNTEER FIRE
DEPARTMENT; CRAWFORD TOWNSHIP VOLUNTEER FIRE DEPARTMENT,
INC.; DAVID F. SCANLON, II, named in his individual and
representative capacities; MICHAEL CARTER, named in his
individual and representative capacities; TERRY KING, named
in his individual and representative capacities; JERIT VAN
AUKER, named in his individual and representative
capacities; CHRIS DAILEY, named in his individual and
representative capacities,

            Defendants – Appellees.

―――――――――

Appeal from the United States District Court for the Eastern
District of North Carolina, at Elizabeth City.   Terrence W.
Boyle, District Judge.  (2:10-cv-00017-BO)

―――――――――

Argued:  March 21, 2013              Decided:  May 29, 2013

―――――――――

Before WILKINSON, KING, and WYNN, Circuit Judges.

―――――――――

Affirmed by unpublished per curiam opinion.

―――――――――

**ARGUED:**   Megan   Kathleen   Mechak,   WOODLEY   &   MCGILLIVARY,
Washington, D.C., for Appellant.   Paul H. Derrick, CRANFILL,
SUMNER & HARTZOG, LLP, Raleigh, North Carolina; Jacqueline Terry
Hughes, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Raleigh, North

Carolina; Jeffrey Allen Doyle, HEDRICK, GARDNER, KINCHELOE & GAROFALO, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Thomas A. Woodley, WOODLEY & MCGILLIVARY, Washington, D.C., for Appellant. Katie W. Hartzog, CRANFILL, SUMNER & HARTZOG, LLP, Raleigh, North Carolina, for Appellees Crawford Township Volunteer Fire Department, Inc., and Chris Dailey; Theresa Sprain, Kristen Riggs, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Raleigh, North Carolina, for Appellees County of Currituck, David F. Scanlon, II, and Michael Carter.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Duane Minnick appeals from the district court's award of summary judgment to the defendants in this 42 U.S.C. § 1983 proceeding in the Eastern District of North Carolina. Minnick, a former firefighter and emergency medical technician ("EMT") in Currituck County, initiated this action against the County, the Knott's Island Volunteer Fire Department, the Crawford Township Volunteer Fire Department, plus five officials connected to one or more of those entities: Daniel Scanlon, Michael Carter, Terry King, Jerit Van Auker, and Chris Dailey, sued in their individual and representative capacities.[1] Minnick alleged, inter alia, that his constitutional rights to free speech and free association were contravened by employment actions taken against him, including burdensome transfers and termination of his employment.

In entering its judgment on behalf of the defendants, the district court explained that they did not have policymaking authority in the County and could not be held responsible for Minnick's transfers or termination. <u>Minnick v. Currituck Cnty.</u>,

_____

[1] Daniel Scanlon is incorrectly named "David F. Scanlon" in the docket of the district court.

3

No. 2:10-cv-00017 (E.D.N.C. May 14, 2012) (the "Opinion").[2] We affirm because, on a more fundamental level, Minnick has failed to create a genuine issue of material fact permitting a jury to conclude that the defendants violated his First Amendment rights in any respect.

## I.

### A.

Minnick filed this lawsuit on May 7, 2010. His two-count Second Amended Complaint — the operative complaint — alleges, inter alia, that the defendants "engaged in adverse actions, omissions and decisions, including threatening, coercing, intimidating, and harassing" Minnick, by subjecting him to a hostile work environment, reprimanding and transferring him from one fire station to another, and terminating his employment as a professional firefighter because of his involvement in an organized labor union (the "free association claim"), and his insistence on speaking out regarding matters of public concern (the "free speech claim"). Complaint ¶¶ 69, 78.[3] The Complaint specifies that the defendants thereby abridged Minnick's First

---

[2] The Opinion is found at J.A. 2887-94. (Citations herein to "J.A. _____" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[3] The Complaint is found at J.A. 127-52.

Amendment rights; that the bases propounded by the defendants for their actions were pretextual; and that they caused Minnick "to suffer humiliation and harm to his reputation, emotional and mental injuries, pain and suffering, financial and other adverse consequences." Id. ¶¶ 78-80. Minnick requests a court declaration that the defendants' actions toward him violated his First Amendment rights, and he seeks injunctive relief and damages.

B.

Currituck County, adjoining the Atlantic Ocean in the northeast corner of North Carolina, encompasses an extensive coastal area incorporating the mainland and several island communities. Because of its size and geographic limitations, the County avails itself of both professional and volunteer firefighters for fire and emergency first responder protection. Knott's Island and Crawford Township are two of six non-profit entities organized to provide fire protection and EMT services to the County. The six fire departments, commonly called stations, invite applications from volunteer firefighters and all volunteers accepted become members of a station.

Each station is governed by a Board of Directors comprised of a President (who serves as Board Chair), plus a Vice President, Secretary, Treasurer, and three at-large members. The Board appoints the station's Fire Chief. The Fire Chief is

5

in charge of the station, establishes its rules, and has the power to discipline and suspend its members, as described in the station's articles of incorporation. See J.A. 385-92.

As a matter of practice, the County enters into a contractual relationship with each station. Pursuant to contract, a station provides personnel and equipment for fire protection and EMT services in exchange for payments from the County. The contract requires the stations to also use and house certain paid employees of the Currituck County Fire and Emergency Medical Services Department (the "County Emergency Department"). As a result, each of the six stations is staffed with a mix of volunteer firefighters and paid employees serving as firefighters and EMTs. The volunteers and paid employees interact and work together while on duty and in responding to emergency calls. The professionals at the various stations are under the direction of Scanlon (the County Manager) and Carter (the Chief of the County Emergency Department) as well as various supervisors and captains at each station. See, e.g, Crawford Township Contract, J.A. 395-401.

The Fire Chiefs of the various stations do not possess supervisory control over professional employees of the County Emergency Department. Thus, the Fire Chiefs are not permitted to transfer, discipline, or terminate a professional employee. The contracts between the stations and the County provide that,

6

as a courtesy, the County Emergency Department will consult with the appropriate Chief prior to any permanent move, transfer, or reassignment of the County's professional personnel.

C.

The facts relevant to this appeal are drawn from a full record made after discovery proceedings conducted in the district court. We recite the facts in the light most favorable to Minnick, as the nonmoving party. See Laing v. Fed. Express Corp., 703 F.3d 713, 714 (4th Cir. 2013).

1.

Minnick was employed as a paid firefighter and EMT by the County Emergency Department for more than two years, from April 9, 2007, until August 11, 2009. He was first assigned to Lower Currituck Station, also known as Waterlily Station. Minnick's initial six-month performance review, dated October 2, 2007, reveals positive evaluations — either "Highly Commendable" (the second highest of five evaluation levels), or "Proficient and Fully Competent" (the middle evaluation). There were observations made on his initial review, however, of "some small issues with [volunteer] Fire Department members," written in the comment space on the evaluation form under the category "Cooperation and Teamwork." J.A. 803.

2.

a.

In October 2007, Minnick was transferred from Waterlily Station to Crawford Township. Minnick requested the transfer because "[t]he Crawford station was much . . . busier, ran more calls [than Waterlily Station], and [he] wanted to get out and run more calls." J.A. 1096. About this same time, in late 2007, Minnick initiated an effort to organize a chapter of the International Association of Fire Fighters ("IAFF") for the County's EMTs and firefighters. County Emergency Department Chief Carter, a former IAFF member himself, initially expressed some hesitancy about a labor union, believing it would cause tension between the paid County employees and the volunteers at the various stations, but he subsequently assisted Minnick with the union activities. See id. at 2152, 2154.

An issue involving Minnick's conduct at Crawford Township was documented in a personnel incident report on January 22, 2008. See J.A. 371. Captains Cheryl King and Bruce Miller reported that, on January 18, 2008, Minnick telephoned King at about 8:30 p.m. to tell her that he was not feeling well and wished to depart the station. While King was seeking a relief worker to cover the shift, Minnick phoned again to inform King that he was already on his way home. According to the incident report, Minnick violated established County Emergency Department

8

policy prohibiting employees from departing their positions unless properly relieved, or instructed to leave by a captain. The report related that there had been other questionable incidents regarding Minnick abusing his sick leave. See id.

That same evening, shortly before leaving the station, Minnick sent an email to his former Chief at Waterlily Station, accusing him of neglecting his duties. See J.A. 369. As a result, Minnick was the subject of another Crawford Township personnel incident report on February 7, 2008. Minnick thereafter agreed that it was wrong for him to send the email while on duty, and he apologized to the Waterlily Chief and other affected persons. See id. at 1037-38. This incident report specifies that it constituted a written warning to Minnick. See id. at 370.

One week before the second incident report, on January 31, 2008, Minnick had successfully organized a local affiliate of the IAFF, named the Currituck County Professional Fire Fighters and EMS Local 4633 ("Local 4633"). Local 4633 included County Emergency Department paid firefighters and EMTs, and its membership elected Minnick as President. During Minnick's employment with the County Emergency Department and his tenure as President of Local 4633, he spoke out concerning safety issues and unsafe practices that he observed at the various stations. While at Crawford Township, Minnick alerted Captain

9

Miller and the station Chief, Chris Dailey, to several safety issues. Specifically, Minnick expressed concerns about an out-of-date airpack on one of the fire trucks, malfunctioning seatbelts on another truck, and balding tires on an ambulance. Chief Dailey once told Minnick to "quit pestering him" about fire department problems, and Minnick asserts that he was informed by someone else that such issues were "not a union concern." J.A. 1108-09, 2185.

b.

After his transfer to Crawford Township, Minnick had personality conflicts with several of the volunteer firefighters there, with the volunteers reporting that Minnick talked down to them and called them derogatory names. These conflicts were reflected in Minnick's one-year performance review of April 19, 2008, where he was afforded less positive remarks than those in his initial evaluation. Minnick received evaluations of "Needs Development" in the areas of "Cooperation and Teamwork" and "Communication and Interpersonal Skills," and the report related that Minnick had issues with volunteer firefighters, "[u]sually due to confrontations with members or officers." J.A. 811. The

10

evaluation also specified personality conflicts between Minnick and volunteer members and officers.[4]

### c.

On June 1, 2008, at the scene of a motor vehicle accident, Minnick and a co-worker, volunteer firefighter Christopher Pope, had a disagreement over Minnick's authority to move the involved vehicles. Their confrontation featured profane language and various threats of bodily harm. Captain Miller witnessed the altercation and submitted an incident report to County Emergency Department Chief Carter, emphasizing that Pope was the instigator and aggressor. Carter brought the incident to Scanlon's attention, as well as that of the County Attorney, in order to assess the need for further action. Although no action was taken against Pope because he was a volunteer, Carter requested that Chief Dailey address the incident with Pope and hold him accountable for his actions. Pope received a verbal warning, and Minnick was not disciplined.

### 3.

After the incident with Pope, Minnick and his partner, Josh Nowicki, requested transfers from Crawford Township to Moyock

---

[4] At one point, his supervisors agreed to allow Minnick to transfer from Crawford Township, but he declined such a transfer, advising that he preferred to stay and try to work out his differences with the other Crawford Township personnel.

11

Station. They did not receive their first transfer choice, however, but were transferred to Corolla Station. Minnick believed the denial of his first-choice transfer was because Carter did not want to have union officials at Moyock. According to Minnick, this was the first instance of discrimination against him for his union activities. See J.A. 1198, 2186. Minnick worked at Corolla for about six months, from June to December 2008. The two-hour commute from his home to Corolla was unduly burdensome, however, and Minnick secured a transfer from Corolla to Knott's Island.

4.

a.

Not long after his Knott's Island transfer, Minnick began having problems with the volunteers there. In one instance, Minnick was yelled at by Terry King, the President at Knott's Island, for moving furniture. Minnick had moved a desk in the common area at the station because the internet cable would not otherwise reach. King told Minnick "You think you can touch anything because you're the union president." J.A. 433. On another occasion, Minnick asked King for a key to the storage building, and King responded that he did not want to talk to Minnick. See id. at 434.

There were several complaints from volunteer firefighters at Knott's Island that Minnick was parking his personal vehicle

12

in a prohibited area. Barbara Hill, a member of the Knott's Island Board, confirmed that certain volunteer firefighters would not come to the station when Minnick was working due to personality conflicts with him. Although Minnick was informed of the complaints against him, he was not disciplined for most of them. Minnick's behavior at Knott's Island nonetheless resulted in four significant disciplinary write-ups.

b.

On February 20, 2009, Minnick was the subject of a personnel incident report completed by Captain Miller. The report related that Minnick had violated County Emergency Department policy when, without first seeking approval from his supervisors, he arranged for a co-worker to cover his shift. The incident report reflected that it was a verbal and written disciplinary action. See J.A. 379. The incident resulted in a thirty-day suspension of certain of Minnick's privileges.

A second personnel incident report, dated July 11, 2009, reflects that Minnick failed to show up for work as scheduled on June 26, 2009. See J.A. 380. Also on July 11, Minnick received a third personnel incident report documenting that, on June 11, 2009, he had arrived late for his scheduled shift by an hour and fifteen minutes, out of uniform and not ready to work. See id. at 381-82. This incident report reflects that it was a "[f]inal written warning." Id. at 381.

13

On August 10, 2009, Terry King lodged a written complaint against Minnick. King's letter alleged that since Minnick's assignment to Knott's Island, he had ignored the rules and disrespected the station's members. King also described an incident where Minnick parked his personal vehicle in front of the station in a no-parking zone. Despite being advised to move his car, Minnick refused. The vehicle apparently remained in the no-parking zone for Minnick's entire twenty-four-hour shift. During Minnick's next shift, lasting eighteen hours, he parked the vehicle in the same area the entire time. King's letter contended that "[t]his behavior is typical of [Minnick's] rebellious attitude and the lack of respect he has displayed toward the fire department." J.A. 410. King also asserted that Minnick had been confrontational with the volunteer firefighters, and that certain members would not go to the Knott's Island station when Minnick was working there.

As a result of King's complaint letter, Minnick's final personnel incident report at Knott's Island, dated August 11, 2009, specified that Minnick was ignoring the station's rules and "presenting an attitude that is not conducive for harmony in the station." J.A. 383. This incident report recited that Minnick had served at every station in the County save one, and that, in most instances, the volunteer firefighters had requested that he be transferred. The report, completed by

14

County Emergency Department Chief Carter, recommended that Minnick be terminated from employment with the County Emergency Department. As reflected in the report, Scanlon had approved the termination recommendation.

5.

Minnick thereafter filed a grievance contesting his discharge. A hearing was conducted on September 24, 2009, and, on October 15, 2009, Scanlon reaffirmed Minnick's termination of employment "[b]ased on my review of [Minnick's] personnel record and the information elicited during my investigation." J.A. 415. In his grievance ruling, Scanlon recited the details of Minnick's entire disciplinary record, explaining that, by his own admissions, Minnick had "acknowledge[d] and recognize[d] these prior disciplinary actions and accept[ed] 'full responsibility for those lapses.'" Id. Scanlon related that Terry King's complaint letter was "the final complaint preceding termination." Id. As Scanlon explained,

> the basis of the progressive personnel actions taken as noted in the Personnel Incident Reports is your failure to follow policy and to report to your duty station; not, as you assert, our association with the IAFF Union. Therefore, the portion of Terry King's letter that is germane to this hearing is the claim of your "blatant disregard of orders given."

Id.

15

D.

On May 14, 2012, the district court filed its Opinion awarding summary judgment to the defendants. The court ruled that, because Knott's Island and Crawford Township did not have supervisory control over Minnick, who was a County employee, and because neither station had policymaking authority with respect to Minnick's union activities or speech, Knott's Island and Crawford Township could not be liable for Minnick's transfers or termination. See Opinion 5-6.

With respect to the County defendants — County Manager Scanlon, County Emergency Department Chief Carter, and Currituck County — the district court concluded that, under North Carolina law, none of them could make personnel policies. That authority resides instead, according to the court, solely with the County's Board of Commissioners. See Opinion 6-7. Inasmuch as Minnick had never maintained that the Board of Commissioners was aware of any alleged constitutional violations, and because the Board had neither participated in nor condoned any of the challenged actions, the court ruled that Minnick had "failed to demonstrate the necessary involvement by the relevant final policymaking authority and his claims must be dismissed." Id.

16

at 8.[5]  Finally, the court granted summary judgment to each of the individual defendants — King, Van Auker, and Dailey — without further explaining its rulings.  See id. at 8.  Minnick has timely noticed this appeal, and we possess jurisdiction under 28 U.S.C. § 1291.

## II.

We review de novo an award of summary judgment, "applying the same legal standards as the district court."  Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).  We also review de novo the district court's "determination of whether an individual exercises final policymaking authority in a particular area."  Austin v. Paramount Parks, Inc., 195 F.3d 715, 729 (4th Cir. 1999).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based on the "materials in the record."  Fed. R. Civ. P. 56(a), (c)(1)(A). We are entitled to sustain a district court's judgment on "any ground apparent from the record."  CFA Inst. v. Inst. of

---

[5] Because there is no genuine dispute of material fact regarding whether the defendants contravened Minnick's First Amendment rights, we need not reach or address the district court's ruling that Minnick's claims against the County and its officials are legally flawed.  We make no determinations in that respect.

17

<u>Chartered Fin. Analysts of India</u>, 551 F.3d 285, 292 (4th Cir. 2009).

## III.

Section 1983 of Title 42 provides judicial redress for constitutional violations carried out under color of law. The statute provides, in pertinent part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects . . . any citizen . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

In <u>Goldstein v. Chestnut Ridge Volunteer Fire Co.</u>, relied on by the parties, the plaintiff brought a § 1983 action, alleging violations of his First Amendment rights. <u>See</u> 218 F.3d 337 (4th Cir. 2000). In resolving that case, we first had to determine whether the defendant, a volunteer fire department, was acting under color of state law, and if so, whether the plaintiff could establish a violation of the First Amendment. In Minnick's case, however, an assessment of whether the volunteer firefighter defendants were acting under color of state law would be overindulgent. Put simply, viewing the facts in the proper light, none of the defendants have violated any of Minnick's constitutional rights. By way of explanation, we

18

first discuss Minnick's free speech claim, and then his free association claim.

A.

The First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Although a public employee does not have a constitutional right to his job, a public employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983). To determine whether an employment action violated a public employee's free speech rights, we consider: (1) whether the public employee was speaking as a citizen, not as an employee, on a matter of public concern; (2) whether the employee's interest in the expression at issue outweighed the employer's interest in providing effective and efficient services to the public; and (3) whether there was a sufficient causal nexus between the protected speech and an alleged adverse employment action. See McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998).[6]

---

[6] The term "adverse employment action" is typically used in Title VII cases, in the context of establishing a prima facie case of discrimination. See Gerner v. Cnty. of Chesterfield, 674 F.3d 264, 266 (4th Cir. 2012) (explaining that, to establish prima facie case, "plaintiff must show: (1) membership in a (Continued)

19

Assuming that Minnick's conduct and speech regarding the safety of firefighting equipment fulfills the first two prongs of the McVey test, he is yet unable to satisfy McVey's third prong, that is, causation, which requires proof of a sufficient nexus between protected speech and an adverse employment action by Minnick's employer. See Huang v. Bd. of Governors, 902 F.2d 1134, 1141 (4th Cir. 1990) (dismissing First Amendment § 1983 claim for failure to show "but for" connection). Here, viewing the facts in the light most favorable to Minnick, there is no genuine issue as to whether he suffered an adverse employment action as a result of his speech.

Notably, the complaints about Minnick's behavior during his employment with the County predate the first instance of his speaking out about safety concerns. Although Minnick argues that complaints about his behavior only began after he became President of Local 4633 in January 2008, his October 2, 2007 evaluation at Waterlily Station reflects that he already had "some small issues with [volunteer] Fire Department members."

---

protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment." (emphasis added) (internal quotation marks omitted)). We use the term in this case, however, to describe those actions of the defendants asserted by Minnick to have violated his First Amendment rights, including his transfers and termination.

J.A. 803. According to Minnick's own testimony, his protected speech was not uttered until later, while he was assigned to Crawford Township between late October 2007 and June 2008. During that period, Minnick addressed with both his county supervisors and Chief Dailey at least three issues — an out-of-date air pack, malfunctioning seatbelts, and balding tires.[7] While at Crawford Township and Knott's Island, Minnick received several personnel incident reports, documenting violations of established policies. Although Minnick suggests that he was punished more harshly than necessary as a result, his only

---

[7] On appeal, Minnick maintains that he "rais[ed] important safety issues" while at Waterlily Station, but the evidence does not support this assertion. Br. of Appellant 8. Minnick's deposition concerning his time at Waterlily Station reveals only that he expressed dismay that he was not certified to drive the fire truck. Minnick also complained about a speeding fire truck, but he was unsure whether he was working at Waterlily Station or Crawford Township at the time. Minnick admitted that he had no other issues during his tenure at Waterlily Station. See J.A. 1096-97.

In his appellate brief, Minnick seeks to tie his October 2007 transfer from Waterlily Station to Crawford Township to punishment for speech about unsafe practices at Waterlily Station. Minnick's deposition testimony, however, reveals that he actually requested the transfer:

Q: What was the reason you transferred over to Crawford [station]?

A: The Waterlily station wasn't very busy. The Crawford station was much more busier, ran more calls, and I wanted to get out and run more calls.

J.A. 1096.

21

specific assertions of retaliatory or discriminatory adverse employment actions are (1) his transfer from Crawford Township to Corolla in June 2008, and (2) the August 2009 termination of his employment with the County.

The first of those actions, Minnick's transfer to Corolla, followed his altercation with volunteer Pope. Minnick maintains that this transfer was punitive, but he points to no evidence supporting that proposition. Rather, the evidence is that, after the Pope altercation, Minnick requested a transfer to Moyock Station, which was denied by Chief Carter. He was instead transferred to Corolla. Minnick maintained that Corolla was not his first choice for a transfer, and that he felt that he was being punished and discriminated against by Carter. See J.A. 1199. Minnick also asserted, however, that he was "excited" about the Corolla transfer and felt that "the move to Corolla was for the best." Id. In sum, the Corolla transfer is Minnick's first suggestion of a retaliatory or discriminatory employment action, and its purportedly adverse nature is refuted by Minnick's own testimony.

Minnick's termination by the County, assuredly an adverse employment action, occurred after he had been transferred to Knott's Island — again at his own request. The termination followed four discrete incident reports and disciplinary actions against Minnick at Knott's Island for violations of station and

22

County policy. Notably, the final decision to terminate Minnick was recommended by Chief Carter and accepted by Manager Scanlon, who explained that it was brought about by Minnick's repeated infractions and numerous complaints about his attitude toward volunteer firefighters.

In sum, the two adverse employment actions Minnick seeks to connect with his free speech claim are not linked by any evidence to his expressions on safety concerns beyond the unremarkable coincidence that Minnick happened to speak at the same time he was violating settled policy. As we explained in Goldstein, to satisfy the third McVey prong, "the protected speech [must be] a substantial factor in the decision to take the allegedly retaliatory action." 218 F.3d at 352 (internal quotation marks omitted). Minnick has not pointed to any evidence that his circumscribed discussions of safety concerns could have been a substantial factor in either his transfer to Corolla Station or his termination from employment by the County.

B.

Our disposition of Minnick's free association claim is closely related to our rejection of his free speech claim. Both claims arise under the First Amendment, and "[t]he freedom to associate guaranteed by the First Amendment protects associational interests related to speech." Thompson v. Ashe,

23

250 F.3d 399, 406 n.1 (6th Cir. 2001).  We have recognized that "[t]he right to associate in order to express one's views is 'inseparable' from the right to speak freely."  Cromer v. Brown, 88 F.3d 1315, 1331 (4th Cir. 1996) (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)).

Importantly, Minnick's free association claim is predicated on the very facts underlying his free speech claim, in that Minnick contends that his speech regarding safety concerns was made in his capacity as President of Local 4633.  As with his free speech claim, however, Minnick is also unable to show causation with respect to his free association claim.  The evidence demonstrates that there was tension between paid employees and volunteers.  Even if this tension was the result of the paid employees' participation in Local 4633, however, the suggestion of isolated hostility toward the union has not been revealed as plausibly being the motivation for Minnick's transfer denial or termination.

In short, Minnick has failed to show that either of the asserted adverse employment actions emanated from any anti-union sentiments on the part of the defendants.  Moreover, Minnick was

not aware of any county policies — and there were none — against union activities or union support. See, e.g., J.A. 345.[8]

Our analysis of the evidence leads to the inescapable conclusion that Minnick's discipline and termination from employment were the result of undisputed and repeated policy violations, several of which would have warranted termination, and none are shown to be related to union animus. The only suggestion that Minnick's union activities were the bases for any employment actions comes from Minnick's own conjecture. See Stein Seal Co. v. NLRB, 605 F.2d 703, 709 (3d Cir. 1979) (determining that employee's discharge was the result of his provocative conduct and persistent demands, not his union activism, and explaining that "[t]he fact that one has been a union activist does not grant him immunity for that type of insubordination which would not be tolerated from others"). Without more, Minnick's conjecture that adverse employment actions were retaliatory or discriminatory is not sufficient to withstand summary judgment. See Adams v. Trs. of the Univ. of N.C. - Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (recognizing that plaintiff's "own assertions of discrimination

---

[8] Scanlon gave several examples of other employees of the County Emergency Department who were terminated for failure to adhere to protocol, so there is no evidence of any disparate treatment of non-union employees. See J.A. 1712-13.

25

[are] insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action" (internal quotation marks omitted)).

## IV.

Put succinctly, Minnick is unable to demonstrate causation with respect to either of his First Amendment claims, and the district court did not err. Accordingly, the judgment of the district court is affirmed.

AFFIRMED